UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

ALEXIS J. BURNS by and through her legal
guardian, OFFICE OF PUBLIC GUARDIAN
    Plaintiff

v.

HALE AND DORR LLP, et al.,
    Defendants

CIVIL ACTION NO. 05-11113NMG

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
HER MOTION TO COMPEL DISCOVERY**

The Plaintiff, Alexis J. Burns ("Alexis"), by and through her legal guardian, the Office of

Public Guardian ("OPG"), submits this memorandum in support of Plaintiff's Motion to Compel

Discovery.

Alexis seeks an order compelling the Defendants to produce documents and provide

deposition testimony relating to an internal investigation conducted by the defendant Hale and

Dorr LLP ("Hale and Dorr") while it continued to represent its client.[1]  Because courts have held

consistently that no attorney-client privilege attaches to any communications that occur during

such investigations, and because the Defendants have waived any privilege that would otherwise

---

[1]  The Defendants are Hale and Dorr LLP ("Hale and Dorr"), Wilmer Cutler Pickering Hale and
Dorr LLP ("WilmerHale"), Haldor Investment Advisors LP ("Haldor"), and Hale and Dorr
Capital Management LLC ("HDCM").  WilmerHale is the successor in interest to Hale and Dorr
as the result of the merger of Hale and Dorr and Wilmer, Cutler and Pickering LLP.  Haldor was
a subsidiary of Hale and Dorr.  HDCM is the successor in interest to Haldor resulting from a
change in the form of the entity from a limited partnership to a limited liability company.
HDCM is a wholly owned subsidiary of WilmerHale.

attach to their internal communications, Alexis is entitled to discovery of those communications and all documents concerning them.

## **Relevant Facts**

OPG is Alexis's court-appointed legal guardian. Alexis is 18 years old and suffers from cerebral palsy as a result of a difficult delivery at the time of her birth.

Andrew C. Meyer, Jr., Esquire ("Meyer") of Lubin & Meyer, P.C. brought a medical malpractice action on behalf of Alexis and her parents.  In May 1999, after a plaintiff's verdict, Meyer obtained a multi-million dollar recovery on a final judgment in favor of Alexis.  The net amount payable for the benefit of Alexis after deducting fees and expenses was more than $2.4 million (the "Proceeds").

That same month, Meyer and Alexis's father, David Burns ("Mr. Burns"), arranged for Hale and Dorr to create a special needs trust ("SNT") for the benefit of Alexis.[2]  The Proceeds were to be held in trust under the terms of the SNT and were to be invested and managed for Alexis's benefit by Hale and Dorr's investment subsidiary, Haldor.

Even before receiving the Proceeds, attorneys at Hale and Dorr met with David on May 20, 1999 and drafted a declaration of trust, initially titled "Alexis Janet Burns 1999 Irrevocable Trust," for the purpose of establishing the SNT.  A week later, on May 27, 1999, Meyer

---

[2] An SNT is a form of trust that contains special provisions necessary to insure that the Proceeds can be used for the benefit of a person with special needs, but without jeopardizing that person's eligibility for public assistance, including Medicaid and Supplemental Security Income benefits. It is preferable to entrust the authority to manage an SNT to an independent trustee.  The trustee is responsible for ensuring not only that the Proceeds are invested and spent appropriately but also that any expenditures are documented, so as to be able to demonstrate that the rules and restrictions governing SNT's have not been violated.  Furthermore, because Alexis is so young, it was important that the Proceeds be invested carefully so as to have funds available for Alexis's needs throughout her long life expectancy.  When the trustee is a family member, there is an obvious temptation to spend the Proceeds for other purposes, thereby depleting the Proceeds and also jeopardizing the right to continue receiving public benefits.

delivered the Proceeds to Hale and Dorr by messenger, in the form of a check payable to "David Burns, Trustee," with a covering letter describing the check as "the proceeds due to the Alexis Burns Trust from the verdict."

That same day, Mr. Burns met again with attorneys at Hale and Dorr and endorsed the check. Hale and Dorr and Haldor then opened an account under the name "Burns, Alexis AG" (the "Account"), and the Proceeds were deposited to the Account.

Hale and Dorr failed to have David sign the declaration of trust. Nevertheless, Hale and Dorr and Haldor made repeated distributions of moneys to Mr. Burns from the Account. In less than four years, they disbursed to Mr. Burns amounts totaling more than $1.6 million, or two-thirds of the principal that was to provide for Alexis's needs for the rest of her life. They did so without requiring Mr. Burns to demonstrate that he would use the funds for the benefit of Alexis. They also did not require Mr. Burns to document that he was, in fact, spending the funds for Alexis's benefit.

In late April 2003, the Defendants learned from the Kingston, N.H. Chief of Police, Donald Briggs, and others that Mr. Burns was incarcerated and that he had spent some of the Proceeds on illegal drugs. The Defendants reported this information to Hale and Dorr's risk management partner, Michael Heyison, Esquire ("Heyison"). During the next four months, Heyison spoke about the Burns matter with various attorneys and other employees of the Defendants – including John Fabiano, David Megan and Mark Litzerman. He also communicated with several third parties, including: Lynn Aaby, Esquire, who was the court-appointed guardian ad litem for Alexis; Gail Page, the OPG employee responsible for fulfilling

OPG's duties as guardian of Alexis's estate; and Michael Bahan, from the office of the New Hampshire Attorney General.[3]

In June 2003, shortly after OPG was appointed guardian of Alexis's estate, Ms. Page made a written request to the Defendants to transfer all remaining Proceeds to OPG.  Eventually, in two separate transfers on August 20 and 22, 2003, the Defendants transferred the remaining Proceeds, totaling approximately $645,000, to OPG's control.

In April 2004, Mr. Burns signed a written waiver of the attorney-client privilege with respect to Hale and Dorr's representation of him.

### The Discovery Disputes

The Defendants contend that they represented only Mr. Burns in his individual capacity and not Alexis.  Furthermore, they contend that Mr. Burns, as Alexis's father, had the authority to exercise control over the Proceeds and that, when he requested that distributions be made to him from the Account, the Defendants were obligated to comply with those requests.

The Defendants further contend that, from the moment in April 2003 that they learned of Mr. Burns's incarceration, Mr. Heyison, acting in his capacity as Hale and Dorr's risk management partner, had an attorney-client relationship with his fellow partners and the other employees of the Defendants.  The Defendants take the position that, from the moment they first learned in April 2003 that Mr. Burns was incarcerated, all communications between Mr. Heyison and his partners and the other employees of the Defendants during that April-to-August timeframe are protected from discovery by the attorney-client privilege.

---

[3]  Aaby was appointed GAL for Alexis and her two sisters in November 2002 by the New Hampshire Family Court in connection with a custody proceeding.  When word of the possible misuse of Alexis's funds surfaced, the court directed Aaby to investigate.  In May 2003, the New Hampshire Probate Court appointed OPG to serve as guardian of Alexis's estate.

Plaintiff's counsel has deposed the Haldor/HDCM employee Mark Litzerman and the Hale and Dorr attorneys Heyison, John Fabiano, and David Megan.  During those depositions, Plaintiff's counsel has questioned each witness about conversations he had with other attorneys and employees of the Defendants during the period from late April 2003 through August 2003. Counsel for the Defendants permitted Mr. Fabiano to testify about such conversations without objection.  Copies of relevant portions of the Fabiano transcript are attached as <u>Exhibit A</u>.

However, when Plaintiff's counsel asked similar questions of Heyison, Megan and Litzerman, counsel for the Defendants instructed each witness not to answer those questions, on the ground that the communication is protected from discovery by the attorney-client privilege. Copies of relevant portions of those transcripts are attached as <u>Exhibits B</u> through <u>D</u>, respectively.

The Defendants have also withheld from discovery the two documents listed on their privilege log, a copy of which is attached as <u>Exhibit E</u>.  Those documents consist of an April 29, 2003 memo from Megan to Heyison concerning a telephone call from Chief Briggs, and a May 6, 2003 memo from Fabiano to Heyison concerning "prior matters with Lubin & Meyer and Burns meeting" – presumably a meeting with Mr. Burns that took place in May 1999.

Finally, the Defendants have agreed to produce the time records for Mr. Heyison's activity as Hale and Dorr's risk management partner, but only in redacted form.

## <u>Compliance With Local Rule 37.1</u>

Plaintiff has complied with the requirements of Local Rule 37.1, in that Plaintiff's counsel, Alan Fryer, Esquire consulted with Defendants' counsel, Jerold Facher, Esquire by telephone in the afternoon of September 27, 2006 for approximately ten minutes, and again on October 6, 2006 at 1:30 p.m. at Hale and Dorr for approximately five minutes.  John MacIntosh, Esquire was also present at the October 6 conference.

Counsel for the Defendants agreed to produce a redacted version of Mr. Heyison's time records, but he has refused to produce those records in unredacted form. He has also refused to produce the two documents listed on the Defendants' privilege log, and he has refused to permit the witnesses Heyison, Megan and Litzerman to testify about the Defendants' internal investigation, even though he permitted Mr. Fabiano to do so.

### Specific Discovery Requests In Dispute

The Heyison time records and the documents listed on the Defendants' privilege log were responsive to document requests made by the Plaintiff. The specific document requests in the Plaintiff's First Request For The Production Of Documents By The Defendants, and the Defendants' responses thereto, were as follows:

6.     All notes, memoranda, emails and other Documents created, generated, sent or received by any attorney, employee or Agent of any of the Defendants in connection with the Defendants' representation of Alexis or David Burns.

Response:  Defendants object to this Request on the grounds that it is overbroad, unduly burdensome, and seeks information protected by the attorney-client privilege and the work product doctrine. Defendants object to the request to the extent that it asserts that they represented Alexis Burns on the grounds that it lacks foundation and is contrary to fact. Without waiving the foregoing objections, Defendants will produce any responsive, non-privileged, non-work product documents, to the extent such documents have not already been provided.

7.     All Documents concerning any oral or written communications between any attorney, employee or agent of any of the Defendants and anyone else that relates in any way to the Proceeds or their investment, management, or disbursement.

Response:  Defendants object to this Request on the grounds that it is overbroad, unduly burdensome, and seeks information protected by the attorney-client privilege and the work product doctrine. Without waiving the foregoing objections, Defendants will produce any responsive, non-privileged, non-work product documents, to the extent such documents have not already been provided.

17.     All invoices, billing records, timekeeping records, and other documents generated by or submitted to any of any of the Defendants concerning work performed or fees and expenses billed to Alexis or David Burns or otherwise charged against or deducted from the Proceeds.

<u>Response</u>:  Defendants object to this Request on the grounds that it is overbroad, unduly burdensome, and seeks information protected by the attorney-client privilege and the work product doctrine.  Defendants object to the request to the extent that it asserts that they represented Alexis Burns on the grounds that it lacks foundation and is contrary to fact.  Without waiving the foregoing objections, Defendants will produce any responsive, non-privileged, non-work product documents, to the extent such documents have not already been provided.

In addition, the deposition questions concerning Hale and Dorr's internal investigation are set forth in the excerpts of deposition transcripts that are attached as Exhibits A through D.

<u>**Argument**</u>

It is well established that, when a law firm conducts an internal investigation with respect to a client matter while continuing to represent the client, the attorney-client privilege is not applicable to the firm's internal communications, because the interest of the firm in protecting itself is in conflict with the firm's duty to its client.  Here, all internal communications that occurred through August 22, 2003 are discoverable because, until Hale and Dorr transferred the remaining Proceeds to OPG, it was continuing to represent its client while conducting its internal investigation.

Moreover, by permitting Mr. Fabiano to testify about the internal investigation, the Defendants have waived any privilege that might otherwise attach.  Therefore, the witnesses for the Defendants must answer deposition questions about Hale and Dorr's internal investigation and must produce Mr. Heyison's time records and the documents listed on the Defendants' privilege log, all in unredacted form.

**I.    WHERE A LAW FIRM CONTINUES TO REPRESENT ITS CLIENT WHILE CONDUCTING AN INTERNAL INVESTIGATION, THE ATTORNEY-CLIENT PRIVILEGE DOES NOT APPLY TO ANY COMMUNICATIONS THAT OCCUR AS PART OF THE INVESTIGATION.**

Ordinarily, when an attorney at a law firm conducts an internal investigation of the firm's handling of a matter, the attorney-client privilege attaches to the investigating attorney's communications with attorneys and employees of the firm.  <u>U.S. v. Rowe</u>, 96 F.3d 1294 (9th Cir.

1996).  However, when the firm continues to represent its client while conducting an internal investigation that relates to the firm's representation of that client, the attorney-client privilege is not applicable to the investigating attorney's communications.  Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A., 220 F. Supp. 2d 283 (S.D.N.Y. 2002); Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C., 212 F.R.D. 283 (E.D. Pa. 2002).

In Koen, the defendant law firm, Powell Trachtman, represented the plaintiff Koen in a bankruptcy proceeding in which Koen was a creditor of the debtor. Powell Trachtman continued to represent Koen for more than a month after Koen informed the firm that it was considering bringing a malpractice claim against the firm.  In the meantime, several attorneys at Powell Trachtman who were representing Koen consulted with another attorney in the firm about the firm's potential liability to Koen.

When Koen brought suit against Powell Trachtman, Koen moved to compel discovery of the documents generated by the firm in connection with its internal investigation.  The court held that the documents were discoverable and were not protected from discovery by the attorney-client privilege, because the firm owed a fiduciary duty to its client, and the firm's interest while conducting its internal investigation was adverse to the interests of its client, thereby vitiating the attorney-client privilege among members of the firm.  212 F.R.D. at 285-86.  The court reasoned that the firm's duty to its client was paramount to its own interests, and that it could have avoided the dilemma, either by withdrawing from its representation or obtaining the client's consent.  212 F.R.D. at 286.

Similarly, in Bank Brussels Lambert, the law firm Rogers & Wells ("R&W") was representing Credit Lyonnais Suisse ("CLS") in an action brought against CLS by a third party. After a CLS vice president suggested to R&W that R&W would be liable to CLS if CLS were

8

found liable to the third party, R&W conducted an internal investigation.  Later, after CLS brought a claim against R&W, it sought discovery of the documents generated during R&W's internal investigation.

The court rejected R&W's claim that the documents were protected from discovery by the attorney-client privilege and ordered the documents produced.  220 F. Supp. 2d at 287.  The court concluded that R&W owed fiduciary duties to CLS as its client, and that it was "in no position to claim a privilege against" CLS as its client.  Id.  Accord, In re Sunrise Securities Litigation, 130 F.R.D. 593, 597 (E.D. Pa. 1989) (client entitled to discovery of documents re: firm's representation of itself).

Here, as in Koen and Bank Brussels Lambert, Hale and Dorr was conducting an internal investigation while it continued to represent its client.  Thus, the Defendants are not entitled to invoke the attorney-client privilege in order to protect from discovery the documents and other evidence relating to their internal investigation.[4]

## II.    ALEXIS, THROUGH THE OFFICE OF PUBLIC GUARDIAN AS HER GUARDIAN, IS ENTITLED TO THE REQUESTED DISCOVERY BECAUSE SHE IS THE DEFENDANTS' TRUE CLIENT.

The Defendants may argue that, even if the communications that occurred during Hale and Dorr's internal investigation would not be protected from discovery by their client, Alexis would not be entitled to discovery of those communications because it is only the firm's client that would be entitled to the discovery, and Alexis was not Hale and Dorr's client.  The

---

[4]  The Defendants may claim that, when Hale and Dorr conducted the internal investigation beginning in Late April or May 2003, it no longer represented Mr. Burns.  Any such claim must be rejected.  Haldor continued to manage the investment of the Proceeds and made distributions to Mr. Burns on a regular basis.  Moreover, Mr. Fabiano testified that, when funds were invested for a client at Haldor, an attorney at Hale and Dorr would be involved in "shepherding" the matter through Haldor.  See Exhibit A at p. 64, l. 15 – p. 69, l. 2.  Nor did Hale and Dorr ever notify Mr. Burns that its representation of him had ceased.

Defendants have taken the position that their client was Mr. Burns, and not Alexis. However, any such argument is contradicted not only by the facts, but also by the Defendants' own conduct.

The Defendants have not disputed that the Proceeds at all times belonged to Alexis, and for good reason. The Proceeds were the result of a jury verdict awarding damages to Alexis. No damages were awarded to Mr. Burns. Furthermore, when Mr. Meyer delivered the Proceeds to Hale and Dorr, he stated in his covering letter that the funds were for "the Alexis Burns Trust," and the check was payable to "David Burns, Trustee." Furthermore, Hale and Dorr prepared a declaration of trust for execution by David Burns.

Based upon these facts, Hale and Dorr held the funds in trust for Alexis, and it had a fiduciary duty to Alexis to handle those funds properly. The mere fact that Hale and Dorr chose to designate Mr. Burns as the nominal client when it opened the matter does not relieve Hale and Dorr of its legal duty.

Nor does the fact that Mr. Burns never executed the trust instrument somehow convert Alexis's funds into his funds. The check was not payable to Mr. Burns in his individual capacity. Nor did Mr. Burns's status as Alexis's father give him the legal authority to exercise dominion over Alexis's funds. Moreover, Hale and Dorr acknowledged as much by holding the funds under Alexis's social security number and reporting all income earned by the funds to the IRS and the Commonwealth of Massachusetts under her SSN.

Perhaps most significantly, when Ms. Aaby, as guardian ad litem for Alexis, asked Hale and Dorr in May 2003 not to make any further distributions to Mr. Burns, Hale and Dorr honored that request by refusing Mr. Burns's subsequent request for a distribution. Furthermore, when OPG as guardian requested that the Defendants transfer the remaining Proceeds to OPG's control

in June 2003, the Defendants honored that request as well, without obtaining Mr. Burns's prior consent and without even giving him notice.  If Mr. Burns were Hale and Dorr's true client and if he had had the legal authority to decide the disposition of the Proceeds, it would have been improper for the Defendants to deny his requests for distributions and to transfer the funds to OPG's control without his consent.

In addition, the Defendants themselves have acknowledged that, regardless of the identity of their client, they were at all times holding the funds for the benefit of Alexis.  Therefore, to the extent that Mr. Burns might otherwise be considered the Defendants' client, Alexis (and OPG as her guardian) necessarily stands in the shoes of Mr. Burns with respect to the current discovery dispute.  Moreover, Mr. Burns has signed a written waiver of his own attorney-client privilege.

Therefore, the Defendants cannot be permitted to prevent the Plaintiff from obtaining the requested discovery on the ground that she is not the Defendants' true client.

## III.    TO THE EXTENT THAT COMMUNICATIONS MADE IN CONNECTION WITH HALE AND DORR'S INTERNAL INVESTIGATION MIGHT OTHERWISE BE PRIVILEGED, THE PRIVILEGE HAS BEEN WAIVED.

When the Plaintiff took the deposition of Mr. Fabiano, who was a partner at Hale and Dorr and is a partner at WilmerHale, counsel for the Defendants permitted Mr. Fabiano to answer questions about his communications with Mr. Heyison during the period of Hale and Dorr's internal investigation.  See Exhibit A, p. 46, l. 7 – p. 50, l. 4.  That constitutes a waiver of the privilege.  In re Keeper of Records (XYZ Corp.), 348 F.3d 16, 23-24 (1st Cir. 2003).[5]

Moreover, the waiver is effective not just as to the specific conversation but as to the entire subject matter.  Where, as here, the disclosure of an otherwise privileged communication

---

[5]  Interestingly, Mr. Fabiano failed to make any reference during his deposition to his May 6, 2003 memo to Mr. Heyison that is listed on the Defendants' privilege log.

is made in the course of a judicial proceeding, the waiver extends to the entire subject matter.

Id., 348 F.3d at 24.  By permitting Mr. Fabiano to answer questions about Hale and Dorr's

internal investigation, the Defendants have waived any privilege they otherwise would have had

with respect to their investigation.

### Conclusion

For the foregoing reasons, Plaintiff requests that Plaintiff's Motion to Compel Discovery

be allowed and that the Court enter an order compelling the Defendants:  1) to produce

unredacted copies of the documents listed on their privilege log and any time records kept by Mr.

Heyison in connection with his investigation, and 2) to give deposition testimony concerning all

communications that took place in connection with Hale and Dorr's internal investigation, up to

and including August 22, 2003.

ALEXIS J. BURNS by her legal guardian,
OFFICE OF PUBLIC GUARDIAN

By her attorneys,


   /s/ R. Alan Fryer
R. Alan Fryer (BBO# 180830)
Dorothy M. Bickford (BBO# 566380)
BADGER DOLAN PARKER & COHEN
One State Street
Boston, MA  02109
(617) 482-3030

99932

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED
UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY FIRST-CLASS MAIL.


   10/10/06                                    /s/  R. Alan Fryer
      Date                                           Signature

**Exhibit A**

Exhibits:  1 - 14          Volume 1, Pages 1 - 86

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

                Plaintiff

vs.                 Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

                Defendants

-----------------------------


DEPOSITION OF JOHN FABIANO

Tuesday, August 1, 2006, 10:05 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts


------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

John Fabiano
Volume 1 - August 1, 2006

```
 1    APPEARANCES:

 2    Badger, Dolan, Parker & Cohen

 3         R. Alan Fryer, Esq.

 4         Dorothy M. Bickford, Esq.

 5         One State Street, Suite 600

 6         Boston, Massachusetts 02109

 7         617.482.3030  fax: 617.482.6919

 8         afryer@badgerlaw.com

 9         for Plaintiff

10    Wilmer Cutler Pickering Hale and Dorr LLP

11         Jerome P. Facher, Esq.

12         Mary B. Strother, Esq.

13         60 State Street

14         Boston, Massachusetts 02109

15         617.526.6000  fax: 617.526.5000

16         jerome.facher@wilmerhale.com

17         for Defendants

18    John MacIntosh, P.C.

19         24 Montgomery Street

20         Concord, New Hampshire 03301

21         603.225.1188

22         for Office of Public Guardian

23

24    ALSO PRESENT:  Sarah Yin, intern
```

John Fabiano
Volume 1 - August 1, 2006

Page 3

```
 1              PROCEEDINGS - 10:05 a.m.

 2              -------------------------

 3              JOHN FABIANO, sworn

 4              -------------------------

 5              EXAMINATION

 6   BY MR. FRYER:

 7       Q.  Would you state your full name, please.

 8       A.  John G. Fabiano, F a b i a n o.

 9       Q.  And you are an attorney at Wilmer Hale?

10       A.  Yes, I am.

11       Q.  Are you a litigator by trade?

12       A.  Yes, I am.

13       Q.  So you are familiar with the deposition

14   process?

15       A.  Yes.

16       Q.  I won't give you the spiel, then, about how

17   it all works.

18              Have you ever been deposed yourself?

19       A.  I've never been deposed.

20       Q.  After this you can relate to the client's

21   point of view.

22       A.  Sure.

23       Q.  What's your educational background?

24       A.  I'm a graduate of Phillips Academy,
```

John Fabiano
Volume 1 - August 1, 2006

Page 46

1    before this lawsuit started?

2        A.  No, I don't believe so.

3        Q.  Do you know what the Office of Public

4    Guardian is, the plaintiff in this case?

5        A.  Only from having heard about it in

6    connection with this lawsuit.

7        Q.  Did you become aware sometime in September

8    2003 that the Office of Public Guardian had been

9    appointed as guardian for Alexis Burns?

10       A.  I don't remember when I became aware of

11   that.  I learned that that was so.

12       Q.  Did you learn that before you became aware

13   of this lawsuit?

14       A.  I think so.

15       Q.  Do you recall how you became aware of that?

16       A.  My partner Mike Heyison told me.

17       Q.  What did Mr. Heyison tell you?

18           MR. FACHER:  Objection.  That's probably

19   privileged.  Mr. Heyison was acting as counsel in

20   that capacity.  I don't have the date firmly in

21   mind.

22           THE WITNESS:  I don't either, to be

23   honest.

24           MR. FACHER:  This is after the public

John Fabiano
Volume 1 - August 1, 2006

Page 47

1    guardian demanded the files and made a claim?

2            MR. FRYER:  As you know, the Office of

3    Public Guardian was appointed as guardian for the

4    estate of Alexis in 2003.

5            MR. FACHER:  Yes.  This was when, do you

6    think?

7            MR. FRYER:  But this lawsuit was

8    initiated well after that.  And there was

9    substantial communications between the Office of

10   Public Guardian and Mr. Heyison and you back in the

11   2003 time frame.

12           MR. FACHER:  You are correct.  He can

13   answer.  That's all right.  You are correct.

14           THE WITNESS:  I don't have the question.

15           MR. FRYER:  Can you read back the

16   question.

17           (Question read by the reporter.)

18       A.  My memory is that he told me that the

19   Office of Public Guardian had contacted him about

20   the Alexis Burns matter.  I think he asked me if I

21   had any files.

22       Q.  Do you have any memory as to when that

23   conversation with Mr. Heyison took place?

24       A.  I do not.  I believe it was before the

John Fabiano
Volume 1 - August 1, 2006

Page 48

1    lawsuit was filed.

2         Q.   What was your response to Mr. Heyison?

3         A.   I'm sure I said I'll look to see if I have

4    any files.

5         Q.   And did you find any files?

6         A.   Whatever you have there, those handwritten

7    notes came from whatever file I had.

8         Q.   So you had kept those in your office or in

9    your own files until Mr. Heyison asked you for

10   documents?

11        A.   That's correct.

12        Q.   By the way, do you recall any notes that

13   you found other than the ones that we've already

14   marked as exhibits?

15        A.   No.  I'm not much of a note-taker.

16        Q.   So there were just notes for those two

17   occasions?

18        A.   Yes.

19        Q.   After that request from Mr. Heyison for any

20   documents or files that you had relating to the

21   Burns matter, when did you next have any

22   conversation with anyone at your firm or Haldor

23   concerning the Burns matter?

24        A.   I can't give you the date.  I spoke to

Page 49

1      Mr. Facher and Mr. Heyison on later occasions.

2          Q.  Was that after the lawsuit had been filed?

3          A.  I believe so.

4          Q.  So between the time that the lawsuit was

5      filed and the earlier time when Mr. Heyison asked

6      you if you had any documents relating to the matter,

7      in between those two occasions, did you have any

8      conversation with anyone else at your firm or Haldor

9      concerning the Burns matter?

10         A.  No.

11         Q.  When Mr. Heyison asked you if you had any

12     files, did he tell you anything else about the

13     status of the matter?

14         A.  I don't remember anything else.  And I'm

15     not sure I even remembered who the Burns family was.

16         Q.  Did you have any discussion about who the

17     Office of Public Guardian was?

18         A.  I think he explained the function of the

19     Office of Public Guardian, because it is not a term

20     I would have known.

21         Q.  Do you remember anything else about that

22     conversation?

23         A.  I thought at some point, it may have been

24     in that conversation, that somebody told me that

John Fabiano
Volume 1 - August 1, 2006

Page 50

1    Mr. Burns was in jail.  That made an impact on me.

2        Q.  That made an impact on you?

3        A.  Yeah.  Because I was surprised to hear

4    that.

5        Q.  When you heard that, did that cause you to

6    feel any concern about the status of the Burns

7    matter?

8        A.  No.

9        Q.  So hearing that didn't prompt you to make

10   any further inquiries?

11       A.  No.

12       Q.  Other than making your notes or files

13   available to Mr. Heyison, did you have any other

14   involvement in the transfer of the investment funds

15   over to the Office of Public Guardian?

16       A.  No.

17       Q.  Now, you mentioned that Mr. Meyer had

18   referred other matters to your firm?

19       A.  Yes.

20       Q.  You thought some of those matters may have

21   been before and some after the Burns matter?

22       A.  I know some were before.  I don't know if

23   any were after.  I'm not saying there weren't.  I

24   just don't know.

John Fabiano
Volume 1 - August 1, 2006

Page 64

1    1999, what was your impression of him?

2        A.  He seemed like a pleasant enough man.  I

3    don't have any particular memory of it.  I sort of

4    remember him being a little heavyset.  That's all I

5    can really remember about him.

6        Q.  Beyond that, you don't have a memory of

7    what he looked like or what his personality was?

8        A.  I certainly don't remember his personality.

9    He was young.  He looked like someone who did

10   physical work.  He looked strong.  I don't remember

11   much of what he said in response to the sales pitch.

12   And I remember, as I said, I remember he got lost

13   coming down from New Hampshire.  That's all I really

14   remember.

15       Q.  Was there a reason why, when this matter

16   was referred to you by Mr. Meyer, you got Mr. Fay

17   involved rather than someone else at Hale and Dorr?

18       A.  Yes.  The reason was that -- first of all,

19   I introduced him to Mr. Meyer in earlier matters.

20   And secondly, he worked closely with Haldor on many

21   things.

22       Q.  Was he a trust estates lawyer?

23       A.  I think the phrase they used then was

24   personal law rather than trusts and estates.

John Fabiano
Volume 1 - August 1, 2006

Page 65

1      Q.  But his expertise was handling trusts and

2  estate-type matters?

3      A.  Estate planning, tax matters.

4      Q.  Was he the person in that matter that you

5  primarily had worked with at the firm?

6      A.  There was another one, Jennifer Snyder, and

7  a classmate, Lou Hamel, who is now retired.  Those

8  are the three people I primarily worked with.

9      Q.  You said earlier that you understood the

10  Burns matter to involve especially the investment of

11  the funds on behalf of Mr. Burns, correct?

12      A.  Yes.

13      Q.  If that was the case, why would you involve

14  Mr. Fay?

15      A.  As I said earlier, I thought that Mr. Fay

16  not only worked well with Haldor but he also would

17  take care of any ancillary legal matters that was

18  involved with the investment of those funds.

19      Q.  Did you have any particular reason to think

20  that Mr. Burns needed or might need the kind of

21  trusts and estates expertise that Mr. Fay had?

22      A.  I had no idea of what Mr. Burns' needs

23  were.  It was routine that when you brought a matter

24  in that you would have a lawyer who would shepherd

Page 66

1   it through Haldor, not just give it to the Haldor

2   people.  Sometimes the lawyer bringing it in would

3   shepherd it through.  It wasn't my area of

4   expertise.  It was Michael's.

5        Q.  So Mr. Fay would be a more appropriate

6   person than perhaps someone in Hale and Dorr's

7   business department?

8        A.  Yes.  I would not have gone to a business

9   lawyer to deal with these problems.

10       Q.  So if Hale and Dorr was being asked to use

11  Haldor's services to invest a client's funds, would

12  it be the usual practice for that to be overseen by

13  a lawyer in the personal law group?

14            MR. FACHER:  I object to the form.  You

15  said "that be overseen."  I don't know what you're

16  referring to.

17       A.  The usual practice would be that it would

18  be someone from the personal law department.  It is

19  not inflexible.  There are other people who had

20  large client bases who did this sort of thing.

21  There were some corporate lawyers in the past that I

22  had worked with who did it.  Usually I would go to

23  Michael or Lou Hamel or Jennifer Snyder.

24       Q.  Did you have other clients who wanted to

John Fabiano
Volume 1 - August 1, 2006

Page 67

1    use the Haldor investment services without needing

2    significant associated legal services?

3        A.  Yes.

4        Q.  And in those cases, have you had Mr. Fay or

5    someone else from the personal law group involved to

6    oversee the investment process?

7        A.  Usually Mr. Fay.

8            MR. FACHER:  Wait a minute.  Wait a

9    minute.  You said to oversee?

10           MR. FRYER:  Oversee the investment

11   process.

12           MR. FACHER:  I object to the form.

13   That's not what he testified to.  That's my

14   objection.  There was no oversight involved.

15       A.  Well, I would -- Mr. Facher is correct.

16   Mr. Fay wouldn't oversee the investment process.  He

17   would shepherd the process through Haldor.  He would

18   provide ancillary legal services.  There are clients

19   that are brought in, members of family where the

20   money would be brought in to Haldor and later will

21   decide that they want to do an estate plan and

22   Michael would do it, that sort of thing.

23       Q.  Well, if a client says to you they would

24   like to have Haldor invest their funds for them but

John Fabiano
Volume 1 - August 1, 2006

Page 68

1    they don't at the same time need any significant

2    legal services, would it be customary to open a

3    legal file for that client?

4                MR. FACHER:  Objection to the form.

5        A.  It would be customary to open a case, yes.

6        Q.  A Hale and Dorr or Wilmer Hale case?

7        A.  A Hale and Dorr case, yes.

8        Q.  And when someone is looking just for the

9    investment services from Haldor, you would involve

10   Mr. Fay or someone in a similar capacity so that

11   there would be someone in place to provide any legal

12   services that might be needed?

13       A.  Yes.

14       Q.  Is that right?

15       A.  That's part of why he was involved.  The

16   other part would be so that he would properly

17   shepherd the matter through Haldor.

18       Q.  And when you say properly shepherd the

19   matter through Haldor, what would that shepherding

20   process involve?

21       A.  It would vary from client to client.  It

22   would determine what the client needed, what the

23   client's wishes were, making sure that Jeff Anthony

24   or someone who was the right personality for the

John Fabiano
Volume 1 - August 1, 2006

Page 69

1    client would be matched up.  All sorts of things

2    like that.

3        Q.  So when the Burns matter was referred by

4    Mr. Meyer, Mr. Anthony was the person in charge of

5    Haldor.  You said that earlier?

6        A.  Yes.

7        Q.  At some point he left Haldor?

8        A.  Yes.

9        Q.  And at that point Mr. Litzerman took over?

10       A.  I'm not sure I remember the succession.

11   Mr. Litzerman was there and I think he was there

12   when Jeff Anthony was there, but I don't remember

13   what the hierarchy is.

14       Q.  Do you know whether Mr. Litzerman took over

15   Mr. Anthony's responsibility when Mr. Anthony left

16   Haldor?

17       A.  I do not know that.

18       Q.  Is Mr. Litzerman in charge of Haldor today?

19       A.  I don't believe so.

20       Q.  Who is, do you know?

21       A.  A woman.  I don't remember her name.

22       Q.  To your knowledge, was Mr. Litzerman ever

23   in charge of Haldor?

24       A.  To my knowledge, no.  But that doesn't mean

**<u>Exhibit B</u>**

Exhibits:   122-143          Volume 1, Pages 1-118

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


---------------------------

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

            Plaintiff

vs.               Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

            Defendants

-----------------------------

DEPOSITION OF MICHAEL R. HEYISON

Monday, September 11, 2006, 11:05 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts


------- Reporter:  Susan J. Blatt, RPR -------

sblatt@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

```
 1    APPEARANCES:

 2    Badger, Dolan, Parker & Cohen

 3         R. Alan Fryer, Esq.

 4         Dorothy M. Bickford, Esq.

 5         One State Street, Suite 600

 6         Boston, Massachusetts 02109

 7         617.482.3030  fax: 617.482.6919

 8         afryer@badgerlaw.com

 9         for Plaintiff

10

11    Wilmer Cutler Pickering Hale and Dorr LLP

12         Jerome P. Facher, Esq.

13         Mary B. Strother, Esq.

14         60 State Street

15         Boston, Massachusetts 02109

16         617.526.6000  fax: 617.526.5000

17         jerome.facher@wilmerhale.com

18         for Defendants

19

20    John MacIntosh, P.C.

21         24 Montgomery Street

22         Concord, New Hampshire 03301

23         603.225.1188

24         for Office of Public Guardian
```

Michael R. Heyison
Volume 1 - September 11, 2006

Page 3

```
 1              PROCEEDINGS

 2          MICHAEL R. HEYISON, sworn

 3                EXAMINATION

 4   BY MR. FRYER:

 5      Q.  Would you state your full name for the

 6   record, please.

 7      A.  Michael Recht, R-e-c-h-t, Heyison,

 8   H-e-y-i-s-o-n.

 9      Q.  Now, what's your date of birth?

10      A.  3/11/57.

11      Q.  And you're an attorney?

12      A.  Yes, I am.

13      Q.  And where did you go to college?

14      A.  Yale.

15      Q.  When did you graduate?

16      A.  1979.

17      Q.  And where did you go to law school?

18      A.  Harvard Law.

19      Q.  When did you graduate from there?

20      A.  1982.

21      Q.  Have you had any other postgraduate

22   education?

23      A.  No.

24      Q.  You're an attorney at Wilmer Cutler
```

Michael R. Heyison
Volume 1 - September 11, 2006

Page 29

```
1        A.  Yes.

2        Q.  Now, when did you become aware of the Burns

3   matter?

4        A.  Spring of 2003.

5        Q.  And how did the Burns matter first come to

6   your attention?

7        A.  Someone in the firm called me.

8        Q.  Do you remember who it was?

9        A.  I don't, but I believe it was either Mr.

10  Fay or David Megan.

11       Q.  Do you have any notes of that phone call?

12       A.  Not that I've found.

13       Q.  Do you recall what you were told in that

14  phone call?

15            MR. FACHER:  Objection.  It's a

16  privileged communication.

17            MR. FRYER:  Are you instructing the

18  witness not to answer?

19            MR. FACHER:  Yes.

20            (Instruction not to answer.)

21       Q.  When did you first anticipate that the

22  Burns matter would be a subject of litigation

23  involving any of the named defendants?

24            MR. FACHER:  Object to the form.  Would
```

Michael R. Heyison
Volume 1 - September 11, 2006

Page 35

1      Q.   After you had these phone calls to Chief

2    Briggs and Mr. Bahan, what did you do next?

3      A.   Well, I'm sure I spoke with Mr. Fay, and I

4    believe I spoke with somebody at Hale and Dorr

5    Capital Management.

6      Q.   Was it Mr. Litzerman that you spoke to?

7      A.   It may have been.  Or it may have been an

8    assistant to Mr. Litzerman.

9      Q.   And when you spoke to Mr. Fay after your

10   phone calls with Mr. Briggs and Mr. Bahan, tell me

11   what you remember of that conversation?

12            MR. FACHER:   Objection.

13     A.   I think that's a privileged conversation.

14     Q.   And you're refusing to answer?

15     A.   Yes.

16            MR. FACHER:   I'm instructing the witness

17   not to answer.

18            (Instruction not to answer.)

19            MR. FRYER:   I just wanted to hear it on

20   the record.

21     Q.   Now, when you spoke to this person at Hale

22   and Dorr Capital Management following your phone

23   calls with Mr. Briggs and Mr. Bahan, what do you

24   remember of that conversation?

Page 36

1          MR. FACHER:  Same objection and

2   instruction.

3          (Instruction not to answer.)

4    Q.  After you spoke with Chief Briggs and Mr.

5   Bahan in these first conversations that you've just

6   described, at that time had you made a determination

7   that there was a possibility of litigation in

8   connection with the Burns matter?

9          MR. FACHER:  Object to the form.

10   A.  I can't be that precise on the timing, but

11   it was at or about that time that I heard that there

12   was a claim that Mr. Burns had misused funds, that

13   this was a situation that could give rise to a

14   claim.

15   Q.  When you say "a claim that Burns had

16   misused funds," what claim are you referring to?

17   A.  Well --

18          MR. FACHER:  Object to the form.

19   A.  What Chief Briggs had said to me was that

20   he had had substantial access to funds.  They were

21   calling Hale and Dorr Capital Management because

22   they believed that those were the funds that he had

23   access to and that he was using them for things like

24   drugs, legal defense.  He may have mentioned other

Page 55

1    first time, the fellow from the Attorney General's

2    office, did you tell him that Hale and Dorr Capital

3    Management had put a freeze on the Burns account?

4        A.  I don't remember my conversation with Mr.

5    Bahan.

6        Q.  Do you remember telling Mr. Bahan that

7    someone named Randall Tetreault had authorization to

8    access the funds in the Burns account?

9        A.  No.

10       Q.  Did anyone ever -- let me ask it this way.

11   Was it your understanding at any time that someone

12   named Randall Tetreault had authorization to access

13   the funds in the Burns account?

14           MR. FACHER:  Object to the form.

15       A.  I don't remember hearing that name before.

16       Q.  So you don't have a memory of that person

17   having authorization to access the funds in the

18   Burns account?

19           MR. FACHER:  Object to the form.

20       A.  No, I don't.

21       Q.  Did anyone at Haldor ask you for any proof

22   of Ms. Aaby's authority to deny access to the funds

23   in the Burns account to Mr. Burns?

24           MR. FACHER:  Object to the form.

Michael R. Heyison
Volume 1 - September 11, 2006

Page 56

1    Instruction not to answer.

2              (Instruction not to answer.)

3      A.   He's instructed me not to answer.

4      Q.   I understand.

5              Did you provide anyone at Haldor with

6    any documentation to demonstrate that anyone had the

7    authority to deny Mr. Burns access to the funds in

8    the Burns account?

9              MR. FACHER:   Same objection.   Same

10   instruction.

11             (Instruction not to answer.)

12             MR. FACHER:   Just because it's yes or no

13   doesn't mean it doesn't include privileged

14   information.   You ought to get along with the

15   substance here and not all of these questions that

16   you know are going to require objections.   I'd ask

17   you to remember you're deposing a lawyer and you

18   ought to move it along as quickly as possible.

19     Q.   Do you remember your first conversation

20   with Ms. Aaby?

21     A.   No.

22     Q.   Do you have any memory of any of your

23   conversations with Ms. Aaby?

24     A.   No.

Michael R. Heyison
Volume 1 - September 11, 2006

1    your capacity as risk management counsel?

2        A.   No.

3        Q.   Did you ever speak with Dorothy Wright

4    about the Burns matter?

5        A.   I don't remember that name.

6        Q.   Did you ever speak with anyone who is the

7    grandmother of Alexis?

8        A.   No.

9        Q.   Did you ever speak with someone named Dena

10   Bouzianis?

11       A.   No.

12       Q.   Did you ever speak with Alexis's mother?

13       A.   No.

14       Q.   Do you know if anyone from Hale and Dorr

15   spoke with David Burns after the Burns matter was

16   first brought to your attention?

17            MR. FACHER:   Object to the form.

18       A.   I need a minute to consult with him on a

19   privilege issue.

20            (Conference off the record.)

21            MR. FACHER:   Can we step out for a

22   moment?

23            MR. FRYER:   Sure.

24            (Recess 3:15 to 3:20.)

Michael R. Heyison
Volume 1 - September 11, 2006

1          THE WITNESS:  Could you read that back

2     for me, please.

3              (Read back.)

4          MR. FACHER:  I object and instruct the

5     witness not to answer on the grounds of work product

6     and/or privilege.

7              (Instruction not to answer.)

8      Q.  I'm going to show you Exhibit 17 from Mr.

9     Anthony's deposition.  Have you seen that before?

10     A.  Yes, I have.

11     Q.  What's your understanding of what that

12     letter is?

13          MR. FACHER:  Object to the form.

14     A.  It's a letter from Jeffrey Anthony,

15     managing director of Haldor, to David Burns dated

16     May 27, 1999, countersigned by David Burns.

17     Q.  Is it your understanding this was a

18     standard form of agreement used by Haldor with its

19     clients?

20     A.  I don't know if it was a standard form of

21     agreement.

22     Q.  Would you look at the second page of the

23     letter.

24     A.  Okay.

**Exhibit C**

Exhibits:  37 - 51          Volume 1, Pages 1 - 173

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

Plaintiff

vs.                Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

Defendants

----------------------------

DEPOSITION OF DAVID MEGAN

Tuesday, August 8, 2006, 10:04 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts

------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

David Megan
Volume 1 - August 8, 2006

Page 2

```
 1    APPEARANCES:

 2    Badger, Dolan, Parker & Cohen

 3         R. Alan Fryer, Esq.

 4         Dorothy M. Bickford, Esq.

 5         One State Street, Suite 600

 6         Boston, Massachusetts 02109

 7         617.482.3030  fax: 617.482.6919

 8         afryer@badgerlaw.com

 9         for Plaintiff

10

11    Wilmer Cutler Pickering Hale and Dorr LLP

12         Jerome P. Facher, Esq.

13         Mary B. Strother, Esq.

14         60 State Street

15         Boston, Massachusetts 02109

16         617.526.6000  fax: 617.526.5000

17         jerome.facher@wilmerhale.com

18         for Defendants

19

20    John MacIntosh, P.C.

21          24 Montgomery Street

22         Concord, New Hampshire 03301

23         603.225.1188

24         for Office of Public Guardian
```

David Megan
Volume 1 - August 8, 2006

Page 3

```
 1              PROCEEDINGS - 10:04 a.m.

 2              DAVID MEGAN, sworn

 3              EXAMINATION

 4   BY MR. FRYER:

 5       Q.  Would you state your full name for the

 6   record.

 7       A.  David Charles Megan.

 8       Q.  Have you ever had your deposition taken

 9   before?

10       A.  No.

11       Q.  I'm sure your attorneys have probably given

12   you some indication of what the process is like.

13   For the record, let me just say that I will be

14   asking you questions.  You will be giving answers

15   under oath.  The court reporter will be transcribing

16   all of the questions and answers.  If you don't

17   understand a question or if the question isn't

18   clear, let me know and I'll try to rephrase it in a

19   way that makes sense.

20              At the end of the deposition, a

21   transcript will be prepared and you will have the

22   opportunity to review your testimony and make any

23   corrections that may be required.

24              Do you understand all of that?
```

David Megan
Volume 1 - August 8, 2006

Page 9

1    one attorney is working?

2        A.   Each person might have their own current

3    file on it.   And then at some point files would be

4    merged into one final complete file.

5        Q.   Were the individual files in this matter

6    merged at some point?

7        A.   I don't know.

8        Q.   Do you still have possession of your files

9    relating to the Burns matter?

10       A.   No.

11       Q.   When did you cease to have possession of

12   those files?

13       A.   In 2003.

14       Q.   What happened to them then?

15       A.   I believe at that time I forwarded them to

16   Mike Heyison.

17       Q.   Is he a trust and estates attorney?

18       A.   No.

19       Q.   Before the time that you forwarded your

20   files to Mr. Heyison, had he had any involvement in

21   the Burns matter?

22       A.   Not to my knowledge.

23       Q.   Was there a reason for forwarding the files

24   to Mr. Heyison rather than to Mr. Fay?

David Megan
Volume 1 - August 8, 2006

Page 10

1          MS. STROTHER:  Objection.  Mr. Megan, I

2    instruct you not to discuss any matters that you

3    talked to Mr. Heyison about that are privileged.

4       Q.  I'm not asking for discussions that you had

5    with Mr. Heyison.  I'm asking you -- let me ask it

6    this way.

7              Was Mr. Fay the attorney who was

8    responsible for the Burns matter when you were

9    working on it?

10      A.  Yes.

11      Q.  He was the responsible attorney as

12   designated in the Hale and Dorr file management

13   system?

14      A.  I can't answer that yes or no.

15      Q.  What was the reason for forwarding your

16   files to Mr. Heyison in 2003?

17      A.  He asked me for them.

18      Q.  Did Mr. Heyison say why he was asking for

19   them?

20             MR. FACHER:  Same objection.  I believe

21   it is going to call for a conversation, which that

22   question does call for.  Even though it is leading,

23   it does call for a conversation,.

24             MR. FRYER:  I understand, Jerry.  What

David Megan
Volume 1 - August 8, 2006

Page 11

1    is the defendant's position as to when any lawyers

2    at Hale and Dorr began representing other lawyers at

3    Hale and Dorr in connection with this matter?

4            MR. FACHER:  When was your first letter?

5    Was that 2003?  Off the record.

6            MR. FRYER:  Off the record.

7            (Discussion off the record.)

8      Q.  What was your understanding as to why you

9    were turning your files over to Mr. Heyison?

10           MR. FACHER:  I'm going to object and

11   instruct him not to answer insofar as it involves

12   information based on Mr. Heyison's communications

13   with him.

14           Otherwise, you may answer.

15           MR. FRYER:  I believe I'm entitled to

16   know his state of mind regardless of where it comes

17   from.  I'm not asking for the conversation.

18           MR. FACHER:  But you're not entitled to

19   know what was said.  If included in that answer is,

20   I was acting pursuant to instructions of counsel,

21   then I'm telling him not to answer as to that.

22     Q.  Can you answer the question?

23     A.  I'm not sure I can.  What is the question?

24           MR. FRYER:  Can you read the question

**<u>Exhibit D</u>**

Mark R. Litzerman
Volume 1 - September 6, 2006

Volume 1,  Pages 1-178              Exhibits:   105-121

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

Plaintiff

vs.                 Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

Defendants

----------------------------


DEPOSITION OF MARK R. LITZERMAN

Wednesday, September 6, 2006, 10:10 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts


------- Reporter:  Susan J. Blatt, RPR -------

sblatt@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

Mark R. Litzerman
Volume 1 - September 6, 2006

```
 1    APPEARANCES:
 2    Badger, Dolan, Parker & Cohen
 3        R. Alan Fryer, Esq.
 4        Dorothy M. Bickford, Esq.
 5        One State Street, Suite 600
 6        Boston, Massachusetts 02109
 7        617.482.3030  fax: 617.482.6919
 8        afryer@badgerlaw.com
 9        for Plaintiff
10
11    Wilmer Cutler Pickering Hale and Dorr LLP
12        Jerome P. Facher, Esq.
13        Mary B. Strother, Esq.
14        60 State Street
15        Boston, Massachusetts 02109
16        617.526.6000  fax: 617.526.5000
17        jerome.facher@wilmerhale.com
18        for Defendants
19
20    John MacIntosh, P.C.
21        24 Montgomery Street
22        Concord, New Hampshire 03301
23        603.225.1188
24        for Office of Public Guardian
```

Mark R. Litzerman
Volume 1 - September 6, 2006

Page 3

```
 1                  PROCEEDINGS
 2               MARK R. LITZERMAN, sworn
 3                    EXAMINATION
 4    BY MR. FRYER:
 5       Q.  Would you state your full name for the
 6    record, please.
 7       A.  Mark Randall Litzerman.
 8       Q.  You understand that you're under oath?
 9       A.  Yes.
10       Q.  Have you ever had your deposition taken
11    before?
12       A.  I believe years ago.  I don't recall.
13       Q.  Let me describe the process, and then you
14    can let me know if you have any questions.  I'll be
15    asking you questions and you will answer the
16    questions.  Your answers -- the questions and
17    answers will be transcribed by the court reporter.
18    If you don't understand a question or if it's
19    confusing in some way, let me know, and I'll try to
20    rephrase it in a way that makes sense.  You can
21    answer any questions unless Mr. Facher tells you not
22    to.  And you can take a break any time except when
23    there's a question pending.
24               And once the deposition is over, the
```

Page 159

1     A.   I don't remember the specific sequence of

2   events, but we -- eventually I believe Mike Heyison

3   got involved on our end and instructed that there

4   would probably be a freeze on the assets.

5     Q.   Well, tell me what you remember about the

6   sequence of events as best you can remember it.

7     A.   The sequence of events, we first found out

8   that Mr. Burns was in jail by a phone call from his

9   girlfriend or ex-girlfriend to my assistant, who

10  related that he was in jail.  Which was news to us.

11  It was shortly after that that I got the call from

12  Chief Briggs.  I would have passed that information

13  on to Mr. Fay, or it may have been one of Mr. Fay's

14  associates.  At that point it was sort of out of our

15  hands in terms of what was going on from there.

16    Q.   The person who called your assistant, was

17  that Dina Bouzianis?

18    A.   Yes.

19    Q.   What is the name of your assistant?

20    A.   That would have been Danielle Kelley.

21    Q.   Is she still at Haldor?

22    A.   No.

23    Q.   So Dana Bouzianis called Ms. Kelley and

24  Chief Briggs called you and you called Fay, and what

Mark R. Litzerman
Volume 1 - September 6, 2006

1    happened after that?

2              MR. FACHER:  I don't want you to get

3    into any conversations with Mr. Heyison.  Apart from

4    that, you can answer.

5         Q.  You can tell me if you contacted Mr.

6    Heyison.

7         A.  I don't believe I contacted Mr. Heyison

8    directly.  I believe it came from Mr. Fay.

9              MR. FACHER:  All right.

10        Q.  What was the next involvement that you had

11   with this situation involving the Burns account?

12        A.  My recollection is I was basically waiting

13   for instructions from the law firm, Mr. Fay.

14        Q.  Do you remember speaking on the telephone

15   with someone named Lynn Aaby?

16        A.  I may have had a conversation with her.  I

17   don't remember the specifics.  I recognize the name.

18        Q.  Do you remember getting a call from someone

19   who said they were the guardian ad litem for Alexis

20   Burns?

21        A.  I vaguely remember getting a call, yes.

22        Q.  Did you tell that person about the Burns

23   account?

24        A.  I don't recall what the specifics of the

Mark R. Litzerman
Volume 1 - September 6, 2006

Page 166

1   writing?

2       A.  I don't recall.

3       Q.  Do you have any way of determining when it

4   was that Mr. Heyison gave you those instructions?

5       A.  No.

6       Q.  Did you have any concern that putting a

7   freeze on the Burns account would be inconsistent

8   with this provision in the agency agreement letter

9   saying that you will act only as instructed by Mr.

10  Burns or his legal representative unless Mr. Burns

11  has designated someone else in writing?

12      A.  I had no concerns at that point.  I was

13  relying on Hale and Dorr counsel to instruct us.

14      Q.  Now, other than any discussions you've had

15  with Mr. Heyison back in the spring of 2003 about

16  the Burns account, did you have any discussions with

17  anyone else at Hale and Dorr in that time frame

18  about the Burns account?

19      A.  Not -- I can't recall.

20      Q.  Did Mr. Heyison tell you why the Burns

21  account was being frozen?

22          MR. FACHER:  I'm going to object to that

23  and instruct you not to answer.

24          (Instruction not to answer.)

Mark R. Litzerman
Volume 1 - September 6, 2006

Page 167

1              MS. BICKFORD:  That doesn't ask for the

2    substance of what he said.

3              MR. FACHER:  Yes, that's the question.

4              MS. BICKFORD:  No, he said did he tell

5    you why.

6              MR. FACHER:  I'm not going to argue with

7    you.

8              MS. BICKFORD:  That's a yes or no

9    question.

10              MR. FACHER:  You have my instruction.

11              MR. FRYER:  Is it your position or your

12    client's position, Jerry, that from the moment Mr.

13    Heyison got involved, anything that he said to

14    anyone at Hale and Dorr or Haldor is a privileged

15    conversation?

16              MR. FACHER:  I don't know whether that's

17    my position or not.  I know that this question

18    called for lawyer-client conversation, so that's --

19    when you ask a question that requires yes or no and

20    that contains the substance of the facts, that

21    recites the conversation.

22              MS. BICKFORD:  It does not ask what that

23    reason was.

24         Q.  Without telling me what the reason was, did

Page 168

1    Mr. Heyison give you any reason for freezing the

2    account?

3              MR. FACHER:  I'm not going to permit

4    that.

5              MR. FRYER:  Let's mark this as an

6    exhibit.

7              (Marked, Exhibit 120, letter, May 7,

8    2003.)

9        Q.  Did Mr. Heyison have any legal authority

10   that you're aware of to exercise control over the

11   Burns account?

12       A.  Not that I'm aware of.

13       Q.  Let me show you Exhibit 120.  Have you ever

14   seen a copy of that letter?

15       A.  My recollection is that I did see a copy of

16   this at some point.

17       Q.  This is a letter from the guardian ad litem

18   for Alexis Burns by the name of Lynn Aaby to Mr.

19   Heyison?

20       A.  Yes.

21              MR. FACHER:  Is that how you pronounce

22   it?

23              MR. FRYER:  Yes.

24       Q.  You see in the second sentence of the

## **<u>Exhibit E</u>**



EXHIBIT
Heyison
142
9/11/06 SB

PRIVILEGE LOG OF HALE AND DORR LLP, ET AL.

ALEXIS J. BURNS, BY HER LEGAL GUARDIAN V. HALE AND DORR LLP, ET AL., USDC No. 05-11113 NMG

DATED SEPTEMBER 11, 2006

| Date | Author-From | Recipient | Cc: | Description | Grounds Withheld or Redacted | No. of Pages |
|---|---|---|---|---|---|---|
| 4/29/03 | Megan, D. | Heyison, M. | Fay, M. Litzerman, M. | Memo re: Telephone Call from Kingston Police | Attorney-Client Privileged/Work Product | 1 |
| 5/6/03 | Fabiano, J. | Heyison, M. | | Handwritten Memo re: Prior matters with Lubin & Meyer and Burns meeting | Attorney-Client Privileged | 2 |

US1DOCS 5556909v2