UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                            )
ALEXIS J. BURNS by and through her legal guardian,          )
OFFICE OF PUBLIC GUARDIAN                                   )
                                                            )
        Plaintiff,                                          )
                                                            )
v.                                                          )     C.A. NO. 05 11113NMG
                                                            )
HALE AND DORR LLP, WILMER CUTLER PICKERING                  )
HALE AND DORR LLP, HALDOR INVESTMENT ADVISORS               )
LIMITED PARTNERSHIP, and HALE AND DORR                      )
CAPITAL MANAGEMENT LLC                                      )
                                                            )
        Defendants.                                         )
_____)

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

## FACTS AND LEGAL ISSUE

The facts of this case are simple to outline. David Burns was a client of Hale and Dorr

LLP ("Hale and Dorr"). He came to Hale and Dorr and Haldor Investment Advisors LP

("Haldor") with a check that represented the net proceeds of a judgment in a malpractice case

that had been brought on behalf of his minor daughter, Alexis, by her next friend. David Burns

opened an agency account with Haldor, entitled "Alexis Burns, Agency", of which he was the

owner. A trust for the benefit of Alexis Burns was drafted by Hale and Dorr with David Burns

as Trustee and Alexis Burns, as beneficiary, but Mr. Burns failed to sign it.

Over a period of time, David Burns made withdrawals or directed transfer of the funds in

the agency account which were indicated as being to pay bills or otherwise for the benefit of

Alexis.  At the end of April 2003, Hale and Dorr was informed that Mr. Burns was incarcerated.

There were also allegations from law enforcement officials that he had misused or

misappropriated funds from the agency account.  The Office of Public Guardian was appointed

guardian of Alexis' estate, and the remaining funds were transferred by Hale and Dorr to the

OPG.  As internal counsel to Hale and Dorr and Haldor, Michael Heyison provided legal advice

on these matters.  In August 2005, plaintiff (hereafter "OPG") brought the present suit on behalf

of Alexis.

If any funds were misappropriated by David Burns, Hale and Dorr and Haldor had no

knowledge of the misconduct and had no knowing part in it.  Nor was there any negligence or

breach of fiduciary duty by Hale and Dorr or Haldor.

OPG's recitation of facts in its Motion to Compel and supporting Memorandum contain

inaccurate statements, characterizations and conclusions which are disputed by the defendants

and contradicted by the record.[1]  However, the defendants do not believe it useful or appropriate

in this Opposition to list and describe these inaccuracies and disagreements because, except as

indicated in this Opposition, they are largely irrelevant to the legal issue raised by the Motion to

Compel.  Simply stated, that issue is whether the lawyer-client privilege, which is available to all

litigants, should be denied to a law firm represented by its internal counsel in a suit for

negligence, breach of duty, and Chapter 93A violations.  The defendants strongly believe that the

law firm is entitled to assert its privilege and that the Motion to Compel should be denied.

---

[1]    For example, OPG asserts that in and after May 2003, Haldor "made distributions to Mr. Burns on a regular basis."  OPG provides no record citation for this assertion, and no one so testified.  For other inaccuracies, see notes 8, 10, 12, 14 infra, and Heyison Affidavit, ¶ 6.

US1DOCS 5883934v1

## PRIOR DISCOVERY

OPG has received an enormous amount of discovery including interrogatories, document requests, numerous depositions, and voluminous production of documents by the defendants and other deponents.  This discovery included four depositions of Hale and Dorr attorneys, three depositions of other lawyers, two depositions of Haldor, the production of over 1500 documents by the defendants (including the client files and time entries), and over forty hours of testimony. There were two depositions of Hale and Dorr's counsel, Michael Heyison, one of which was a 30(b)(6) deposition entailing thirty-eight broad and largely irrelevant topics.  Now, as additional and unnecessary discovery, OPG seeks to abrogate the attorney-client privilege and discover all communications between internal counsel for Hale and Dorr and its clients, the attorneys in the firm who were seeking or receiving legal advice.  This intrusion on an important privilege should not be allowed.

## ARGUMENT

I. **HALE AND DORR SHOULD NOT BE DEPRIVED OF THE LAWYER-CLIENT PRIVILEGE WHERE ITS INTERNAL COUNSEL WAS PROVIDING LEGAL ADVICE TO MEMBERS OF THE FIRM IN CONNECTION WITH LIKELY CLAIMS OR POSSIBLE LITIGATION**

A. **The Lawyer-Client Privilege Applies To Communications on Legal Matters Between The Firm's Internal Counsel And The Law Firm Members**

Hale and Dorr is obviously entitled to have internal counsel to advise its lawyers on legal matters and to provide legal advice to the members of the firm in case of anticipated or actual litigation.  It is equally obvious that the lawyer-client privilege is available in these

circumstances.[2]  Here, Michael Heyison, the firm's internal counsel, was providing legal advice

in connection with information he received concerning the alleged conduct of Hale and Dorr's

client David Burns and the possibility of claims against Mr. Burns, Haldor, or Hale and Dorr.

After receiving the information, Mr. Heyison consulted with, and was consulted by, members of

the firm for the purpose of providing legal advice.  (Heyison Affidavit, ¶¶ 3-4)  He was carrying

out the duties and obligations of a lawyer, and communications between him and his clients were

protected by the lawyer-client privilege.[3]  See U.S. v. United Shoe Machinery Corp. 89 F.Supp.

357, 358-59 (D. Mass 1950); see also Nesse v. Pittman, 206 F.R.D. at 325; Lama Holding Co. v.

Shearman & Sterling, 1991 WL 115052, at *1.

B.     **There Is No Basis For An Exception Depriving Hale and Dorr Of The Lawyer-Client Privilege**

OPG readily admits that a law firm, such as Hale and Dorr, is entitled to the lawyer-client

privilege with respect to communications with its internal counsel (Pl. Memo at 7).   To avoid

this adverse conclusion, however, OPG attempts to make it appear that this case is an exception

to that basic principle and similar to two cases cited in OPG's Memorandum.[4]

---

[2]      U.S. v. Rowe, 96 F.3d 1294, 1296-97 (9th Cir. 1996) (applying lawyer-client privilege where internal counsel provided legal advice in anticipation of litigation); Nesse v. Pittman, 206 F.R.D. 325 (D.D.C. 2002) (applying the lawyer-client and work product privileges to in-firm communications in anticipation of litigation, including communications between partners for the purpose of conveying information to the firm's internal counsel); Lama Holding Co. v. Shearman & Sterling, No. 89 Civ. 3639 (KTD), 1991 WL 115052, at *1 (S.D.N.Y. June 17, 1991) (denying plaintiff's motion to compel discovery of client files and time sheet entries finding it "undisputed that an attorney-client relationship can exist within a law firm").  See also Hertzog, Calamari & Gleason v. Prudential Ins. Co. of America, 830 F.Supp. 255 (S.D.N.Y. 1994).

[3]      To try to minimize Mr. Heyison's role as counsel, plaintiff's memorandum constantly refers to him only as "risk management partner"; and not as counsel.  Mr. Heyison was risk management partner but, as he explained in his testimony and affidavit, he was counsel to the firm and its legal advisor.  (Heyison Dep. 5:10-20)  See also Heyison Aff. ¶ 3.

[4]      Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lobardo, P.C., 212 F.R.D. 283 (E.D. Pa. 2002); Bank Brussels Lambart v. Credit Lyonnais (Suisse), S.A., 220 F. Supp. 2d 283 (S.D.N.Y. 2002).

However, OPG's effort to distort the facts of this case into a forced analogy to the cited cases fails completely because of the basic differences between those cases and the present case. Each of the two cases cited by OPG involved (1) a client complaining about malpractice or threatening suit against the firm, (2) an internal investigation, and (3) a conflict of interest with the client.[5]  Here, unlike the cited cases, (1) there was no internal investigation, (2) David Burns, who was Hale and Dorr's client, was not making any claim against the firm, and (3) there was no conflict of interest.[6]

In order to argue an alleged similarity to the two cases, OPG, incorrectly and without record citation, mischaracterizes Mr. Heyison's services as counsel to his client, Hale and Dorr, as an "internal investigation."  The facts, however, do not support that conclusion.  There was no "internal investigation."  No one in Hale and Dorr was being "investigated", there was no requirement or need for an "investigation," no testimony refers to any "investigation", and no record or report of any "investigation" was requested or prepared.  (Heyison Aff. ¶ 5)  Mr. Heyison was simply providing legal advice to his clients who had requested it, and communicating with them about a matter which might involve a claim against Mr. Burns himself, Haldor, or Hale and Dorr.  (Heyison Aff. ¶ 4)

---

[5]    A third case, In re Sunrise Securities Litigation, 130 F.R.D. 560, 597 (E.D. Pa. 1989), was cited in Plaintiff's Memorandum only as an "Accord" authority.  (Pl. Mem. p. 9)  In re Sunrise Securities Litigation was complex multidistrict litigation in which Sunrise, the law firm's client, appears to have been asserting a claim through stockholders.  It is unclear whether an internal investigation by the law firm was involved.

[6]    Even assuming a "conflict" existed, it would "not necessarily follow that [Hale and Dorr] should summarily lose its attorney-client…privileges."  Indeed, to reach this result would "absolutely disable [internal counsel] from giving advice to his firm whenever there was a potential claim against it by a former client."  Nesse v. Pittman, 202 F.R.D. 344, 353 (D.D.C. 2001).  In Neese the court rejected plaintiff's argument that the defendant law firm must forfeit the attorney-client privilege by virtue of its purported conflict of interest in handling the matter internally.  (Eventually, discovery of some documents was allowed because the law firm had improperly disclosed confidential information to the client's opponent).  See also Opinion of New York State Bar Association Committee on Professional Ethics, Topic: Consultation With a Law Firm's In-House Counsel on Matters of Professional Ethics Involving One or More Clients of the Firm, N.Y. Eth. Op. 789 (2005) ("[a] law firm may form an attorney-client relationship with one or more of its own lawyers to receive advice on matters of professional responsibility concerning ongoing client representation(s), including on matters implicating the client's interests, without thereby creating an impermissible conflict between the law firm and the affected clients(s)").

US1DOCS 5883934v1

Without justification, the plaintiff has mischaracterized the facts of this case and ignored the record in order to argue the applicability of their cited legal decisions. Those decisions are all clearly distinguishable, because none of the crucial facts that led the court in each of those cases to deny privilege was present here. Moreover, those cases have also been criticized as wrongly decided and inconsistent with a litigants right to assert the lawyer-client privilege.[7] Accordingly, OPG's contention that there should be an exception to the general rule, and that Hale and Dorr should be barred from asserting the lawyer-client privilege is unsupported, and should be denied.

Similarly, OPG tries to argue that David Burns was not Hale and Dorr's client and that Alexis Burns was the "true client", whatever that invented term means. OPG well knows that Alexis Burns was a minor and not capable of making contracts or entering a lawyer-client agreement and relationship. See e.g., Miller v. Miller, 677 A.2d 64, 67 (Me. 1966) (child has "no authority to appoint an attorney" and any such effort "would be null"). For example, her suit was brought in her name by a next friend (Exhibit 1, Meyer dep. 9:3-5)[8] and the judgment entered in that same form. (Meyer dep. 15:18-23) David Burns was her father, her representative, and had custody (Fay dep. 23:22-23; Fabiano dep. 14:22-15:1) He had been referred to Hale and Dorr and Haldor by the law firm of Lubin & Meyer, P.C., consulted with Hale and Dorr thereafter, and retained them. (Fay dep. 30:1-7) He was the payee on the check from Lubin & Meyer, (Fabiano dep. 19:15-17)[9] endorsed it and signed an agency account with

---

[7]     Elizabeth Chambliss, The Scope of In-Firm Privilege, 80 Notre Dame L. Rev. 1721 (2005) (explaining how Koen, Bank Brussels, and Sunrise were "wrongly decided, on both analytical and policy grounds."); See also Opinion of NY Ethics Bar Assn. Committee on Professional Ethics, supra note 6.

[8]     All of the deposition excerpts are contained in Exhibit A, and are arranged alphabetically. The record citations hereafter omit repetition of "Exhibit A" before the citation.

[9]     The check was payable to "David Burns, Trustee" but no trust existed and no court judgment required a trust. No copy of the reverse side of the check has been located.

US1DOCS 5883934v1

Haldor of which he was the owner. (Heyison dep. 38:17-39:4) Hale and Dorr corresponded with Mr. Burns, sent him bills and drafted a trust for his signature, which despite efforts by Hale and Dorr. (Fabiano dep. 25:6-11) Mr. Burns failed to sign. (Fay dep. 115:23-116:1) He was treated as, and understood by all parties to be the client.[10] (Megan dep. 166:24-167:3, 167:8-11, 17-20)

In addition, OPG recognized that David Burns was Hale and Dorr's client when it provided David Burns' consent in order for Hale and Dorr to turn over client files to the Office of Public Guardian. (Pl. Memo at 4)[11] OPG's present attempt to argue that David Burns was not Hale and Dorr's client is contrary to the facts and the law, and provides no support for denying the lawyer-client privilege to Hale and Dorr.[12]

Finally, if OPG's argument were to be accepted and the privilege forfeited, it would mean that no law firm would ever be afforded the lawyer-client privilege where it employed internal counsel to defend itself against a client's claim. As a result, all communications between internal counsel and members of the firm on legal matters, including counsel's efforts to learn about the claim, to advise his clients, and to plan a course of action, would not be privileged and would be completely open to the plaintiff. Thus, a law firm that exercised its undoubted right to defend itself would be penalized by being deprived of the protection, benefit and purpose of the

---

[10]    Even if there had been an existing trust of which David Burns was trustee, and Alexis the beneficiary, Hale and Dorr's client would be David Burns, the trustee, not Alexis the beneficiary. See Spinner v. Nutt, 417 Mass. 549 (1994) (no attorney-client relationship between trustee's attorneys and trust beneficiaries). Similarly, the plaintiff is incorrect when it asserts Hale and Dorr did not dispute that the proceeds " belonged to Alexis." (Pl. Memo p. 10.) What Hale and Dorr did not dispute was that the proceeds were recovered for the benefit of Alexis. That, however, does not change the fact that David Burns was Hale and Dorr's client.

[11]    David Burns, as Hale and Dorr's client, had to waive his privilege to enable OPG to receive the files. However, that waiver did not and could not waive Hale and Dorr's lawyer-client privilege with its internal counsel.

[12]    The plaintiff also misstates the facts when it argues that Hale and Dorr's transfer of the funds to OPG, Alexis' court appointed guardian of her estate, shows that David Burns was not Hale and Dorr's client. The identity of Mr. Burns, as Hale and Dorr's client was not at issue in the transfer, and it was by virtue of court orders that OPG was entitled to receive the funds.

lawyer-client privilege which would be otherwise available.[13]  This harsh and illogical result would deprive a law firm of a basic right available to all other litigants, and should not be permitted here.

II.    **There Was No Waiver Of The Attorney-Client Privilege.**

OPG's final argument attempts to breach the attorney-client privilege by claiming a complete waiver of all attorney-client communication.  In alleged support of that claim, OPG cites a small portion of the deposition testimony of John G. Fabiano, a partner in the firm.  (Pl. Memo at 11); (Fabiano dep. 46:17-47:21)

Neither this testimony (which does not involve giving or receiving any legal advice), nor anything else in the record indicates any waiver of the lawyer-client privilege.  In fact, the deposition testimony cited by OPG demonstrates the absence of any of the usual conditions that would constitute a waiver of the privilege.

The context of Mr. Fabiano's deposition testimony has great importance because it did not involve a conversation about giving or receiving legal advice.  Mr. Fabiano was first asked whether he knew what the Office of Public Guardian was.  (Fabiano Dep. 46:3-4)  He was then asked whether he was aware in September 2003 that The Office of Public Guardian had been appointed as Guardian (Fabiano dep. 46:7-9), whether he had learned that (fact) before the lawsuit (Fabiano dep. 46:12) and whether he recalled how he became aware of it.  (Fabiano dep. 46:15)  In that context and following those questions, Mr. Fabiano was asked what Mr. Heyison had told him.  (Fabiano dep. 46:17)  After a colloquy, Mr. Fabiano stated Mr. Heyison told him

---

[13]      See supra, notes 2, 5, 6 and 7.  In addition, such a result would be inconsistent with well-settled principles that emphasize the importance of internal counsel in facilitating compliance with law.  See Upjohn Co. v. U.S., 449 U.S. 338, 392 (1981).

US1DOCS 5883934v1

that the Office of Public Guardian had contacted him (Mr. Heyison), adding that he thought Mr.

Heyison asked him for files. (Fabiano dep. 48:3-4)  Later, Mr. Fabiano testified that he thought

Mr. Heyison may have explained the function of the Office of Public Guardian to him.  (Fabiano

dep. p. 49:18-19)[14]

From these mundane statements and recollection of facts, OPG now insists there was a

waiver of the lawyer-client privilege, not just for the specific conversation which contained the

statements, but also for every other lawyer-client communication, oral and written, up until

August 22, 2003.  The argument should be rejected.  Nothing in Mr. Fabiano's testimony

contains a semblance of giving or receiving legal advice, or a discussion of legal matters.  In fact,

the context of the questioning about the Office of Public Guardian, as set forth above, suggests

otherwise.  In that non-privileged context, Mr. Fabiano stated when he had become aware of the

Office of Public Guardian, what he had been told about the Office of Public Guardian, and that

he had been asked for files. The transmittal of such routine factual information from counsel

does not usually constitute a privileged communication.  Upjohn, 449 U.S. at 395 (the lawyer-

client privilege protects the confidential giving of professional advice by an attorney, "not

fact.");  U.S. v. O'Malley, 786 F.2d 786, 794 (7th Cir. 1986) ("a client does not waive the

attorney-client privilege merely by disclosing a subject which he had discussed with his

attorney");  Ullman v. State, 647 A.3d 324, 332 (Conn. 1994) ("communication from attorney to

client solely regarding a matter of fact would not ordinarily be privileged").  By the same token,

permitting that testimony is not and cannot be a waiver of the attorney-client privilege.  See In re

Woolworth Corp. Sec. Litig., No. 94 CIV 2217 (RO), 1996 WL 306576 (S.D.N.Y. June 7, 1996)

---

[14]    OPG's Memorandum is obviously inaccurate when it exaggerates that "Mr. Fabiano was permitted to
testify about the internal investigation." (Pl. Memo. at 7)

(testimony of information factual in nature was not a waiver because the attorney-client privilege did not attach to the disclosed information). The permitted testimony, therefore, does not support any basis for a waiver, even as to the single lawyer-client conversation between Mr. Fabiano and Mr. Heyison, let alone the broad general all-inclusive waiver asserted by OPG. Accordingly, this basis for abrogating the lawyer-client privilege should be denied.

## CONCLUSION

For all the foregoing reasons, the defendants respectfully request that plaintiff's Motion to Compel be denied.

By their attorneys,

/s/ Jerome P. Facher
Jerome P. Facher (BBO #157240)
Mary B. Strother (BBO #631682)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Phone: (617) 526-6000
Fax: (617) 526-5000

October 24, 2006

## CERTIFICATE OF SERVICE

I, Jerome P. Facher, hereby certify that I served a true and correct copy of the foregoing Opposition upon R. Alan Fryer, Badger, Dolan, Parker & Cohen, One State Street, Suite 600, Boston, Massachusetts on this 24th day of October, 2006 by electronic service through ECF, and by first class mail.

/s/ Jerome P. Facher
Jerome P. Facher

- 10 -

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                            )
ALEXIS J. BURNS by and through her legal guardian,          )
OFFICE OF PUBLIC GUARDIAN                                   )
                                                            )
        Plaintiff,                                          )
                                                            )
v.                                                          )    C.A. NO. 05 11113NMG
                                                            )
HALE AND DORR LLP, WILMER CUTLER PICKERING                  )
HALE AND DORR LLP, HALDOR INVESTMENT ADVISORS               )
LIMITED PARTNERSHIP, and HALE AND DORR                      )
CAPITAL MANAGEMENT LLC                                      )
                                                            )
        Defendants.                                         )
_____                     )


## <u>DEFENDANTS' EXHIBIT A TO</u>

## <u>OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY</u>

Excerpts from depositions of:

1. John Fabiano (pages 14, 15, 19, 25, 46, 48, 49)

2. Michael L. Fay (pages 23, 30, 115, 116)

3. Michael R. Heyison (pages 5, 38, 39)

4. David Megan (page 166, 167, 168)

5. Andrew C. Meyer (pages 9, 15)

Exhibits:  1 - 14          Volume 1, Pages 1 - 86

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

Plaintiff

vs.              Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF JOHN FABIANO

Tuesday, August 1, 2006, 10:05 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts

- - - - - - - Reporter:  David A. Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

John Fabiano
Volume 1 - August 1, 2006

**14**

1 funds, and he also invested partners' money.

2 **Q. Meaning partners at Hale and Dorr?**

3 A. Yes. I do remember myself saying I had an

4 account at Haldor with my retirement funds.

5 **Q. Now, in preparation for today's deposition,**

6 **did you review any notes taken by anyone else in**

7 **connection with this May 24th meeting?**

8 A. No.

9 **Q. Do you remember any discussion about the**

10 **fact that the funds recovered for Alexis's benefit**

11 **were solely for her benefit and that there had been**

12 **no recovery for either of her parents?**

13 A. Not at that meeting. I remember Drew

14 telling me that in the initial phone call.

15 **Q. But you do recall learning that Alexis's**

16 **parents were separated?**

17 A. Again, I remember learning that from Drew.

18 I don't remember discussing that at the meeting.

19 **Q. Did you become aware around the time of the**

20 **5/24 meeting that Alexis's parents were not married?**

21 A. No. I never knew that.

22 **Q. Do you remember whether Alexis was living**

23 **with her father?**

24 A. I think I did learn that from Drew. I

**15**

1 wrote that in the initial notes, father has custody.

2 **Q. But did you have any understanding of where**

3 **Alexis was actually living?**

4 A. No.

5 **Q. Maybe you said this already, but at the May**

6 **24th meeting, was there any discussion of**

7 **establishing a trust?**

8 A. I do not remember any such discussion.

9 **Q. Let me show you these notes and ask you if**

10 **you can recognize them. It is a page with Bates**

11 **number HD 149. Do you know whose handwriting that**

12 **is?**

13 A. No, I don't.

14 **Q. Do you see that the notes are dated**

15 **5/24/99?**

16 A. I do.

17 **Q. It refers to a conference with David Burns,**

18 **Jeff Anthony and John Fabiano?**

19 A. Yes.

20 **Q. Do you see that the notes say: "Who should**

21 **be T?"**

22 A. I see that.

23 **Q. And what criterior should be used?**

24 A. If you say so, I'll agree.

**16**

1 **Q. Can you read the words?**

2 A. I can't read the C word. Criterior seems a

3 good guess.

4 **Q. Do you remember any discussion at the May**

5 **24th meeting as to who should act as trustee for the**

6 **funds and what criteria should be considered?**

7 A. I do not remember any such discussion.

8 MR. FACHER: Can we mark this so we keep

9 the record straight?

10 MR. FRYER: Sure.

11 (Marked, Exhibit 3, handwritten notes.)

12 **Q. After this May 24th meeting, what happened**

13 **next that you're aware of in connection with the**

14 **Burns matter?**

15 A. Only by looking at the bill yesterday did I

16 see time entries. And it jogged a memory that there

17 was some question about where the check was. And I

18 remember calling Drew's secretary to have the check

19 brought over.

20 **Q. There's a reference to that on the Hale and**

21 **Dorr invoice?**

22 A. There's a May 27 entry, which I think I had

23 three-tenths of an hour and it showed a telephone

24 call. Then there's a letter that delivers the check

**17**

1 to me in the same day.

2 **Q. Let me show you --**

3 MR. FACHER: Off the record.

4 (Discussion off the record.)

5 **Q. Let me show you the document with Bates**

6 **number HD 787. Is that the letter you just referred**

7 **to?**

8 A. Yes.

9 MR. FRYER: Could we mark that, please.

10 (Marked, Exhibit 4, letter 5/27/99.)

11 **Q. That's the letter you received after making**

12 **the phone call to Mr. Meyer's office?**

13 A. I believe so.

14 **Q. And a check accompanied that letter?**

15 A. That's my memory. I saw the Xerox of the

16 check yesterday.

17 **Q. Let me show you a copy with the Bates**

18 **number LM 007. Is that a copy of the check?**

19 A. Yes.

20 (Marked, Exhibit 5, copy of check.)

21 (Discussion off the record.)

22 **Q. Now, the letter that's marked Exhibit 4,**

23 **was that delivered to you?**

24 A. I believe so.

6  (Pages 18 to 21)

John Fabiano
Volume 1 - August 1, 2006

18

1    Q.  Do you recall who delivered the letter to
2  you?
3    A.  No.  I'm sure it was a messenger.  It
4  wasn't Drew or Kelly.
5    Q.  Do you remember meeting with Mr. Burns
6  about the time that the check arrived?
7    A.  I have a memory that I went down to a
8  conference room and there were people in the
9  conference room.  Michael Fay.  I don't remember
10  whether Jeff Anthony was there, and Mr. Burns, and
11  they handed the check over.
12    Q.  But you remember the check actually being
13  delivered to you?
14    A.  Yes.
15      (Dorothy Bickford has entered the room.)
16    MR. FRYER:  This is Dorothy Bickford.
17    Q.  In the letter marked Exhibit 4 it refers to
18  the check being enclosed, correct?
19    A.  Yes.
20    Q.  And it goes on to say that it represents
21  the proceeds due to the Alexis Burns Trust.  Do you
22  see that?
23    A.  I see those words.
24    Q.  Do you have an understanding of what was

19

1  being referred to by the words Alexis Burns Trust?
2    A.  No.  I don't have any memory of discussing
3  the payee.  I remember calling and saying I need the
4  check, where is the check, and it was delivered to
5  me.
6    Q.  Do you have a memory of ever having any
7  discussion with Mr. Meyer about the funds that he
8  recovered for Alexis Burns being placed into a
9  trust?
10    A.  I do not.
11    Q.  Did you look at the check when the letter
12  arrived?
13    A.  I'm certain I did, if for nothing else to
14  make sure the amount was right.
15    Q.  If you look at Exhibit 5, do you see that
16  the payee on the check is David Burns, trustee?
17    A.  I see that's what it says.
18    Q.  And it says in the reference in the lower
19  left that it is for Burns, A?
20    A.  Yes.
21    Q.  Did you understand the Burns, A to be a
22  reference to Alexis Burns?
23    A.  I don't remember thinking about it then.  I
24  would interpret that now as being for Alexis Burns.

20

1    Q.  Do you remember having any thoughts about
2  the payee indicating that it was payable to David
3  Burns as trustee?
4    A.  No, I do not.  As far as I was concerned,
5  this was money that was going to be invested by
6  David Burns with Haldor.  I didn't think any further
7  about it than that.
8    Q.  Now, you indicated a moment ago that you
9  had reviewed some of your firm's invoices in
10  connection with this matter; is that correct?
11    A.  I simply looked at my own time entries on
12  the bill.
13    Q.  Let me show you a letter dated December 29,
14  1999 with Bates number HD 0852 with an invoice
15  attached.  Is that the invoice that you were
16  referring to?
17    A.  Yes.  The invoice is what I looked at.  I
18  don't remember if it was attached to the letter.  I
19  didn't look at the letter.  I just looked at the
20  entries on the detail sheet of the bill.
21    Q.  Now, the invoice consists of a summary page
22  at the beginning; is that right?
23    A.  Yes.
24    Q.  That's the first page after the letter?

21

1    A.  Mm-hmm.
2    Q.  And following that are the detail entries?
3    A.  Yes.
4    Q.  Now, if you look at the first page of
5  detail entries which has Bates number HD 0854, the
6  first entry reflecting time billed by you is May
7  24th?
8    A.  That's correct.
9    Q.  And there's another entry on May 27?
10    A.  Yes.
11    Q.  And the May 24th entry corresponds to that
12  meeting that you referred to earlier?
13    A.  Yes.  I think that's the sales pitch
14  meeting, bring the money to Haldor.
15    Q.  And that meeting is described in the
16  invoice as conference with Mr. Burns, Mr. Fay and
17  Mr. Anthony?
18    A.  Yes.  And the telephone from Mr. Burns, I
19  have some vague memory that he got lost on the way
20  down from New Hampshire and called me for
21  directions.  I don't think it is anything beyond
22  that.
23    Q.  So your time entry for that day totals an
24  hour and a half, correct?

John Fabiano
Volume 1 - August 1, 2006

22

1     A. Yes.
2     Q. And that reflects essentially the length of
3  the meeting?
4     A. I think that's right.
5     Q. And then the May 27 entry for your time is
6  three-tenths of an hour?
7     A. Yes.
8     Q. The services described includes a meeting
9  with Mr. Burns, Mr. Anthony and Mr. Fay; is that
10 correct?
11    A. That's correct.
12    Q. Is that when you dropped in on the
13 conference room?
14    A. When I got the check.
15    Q. And telephone to Mr. Meyer?
16    A. I think that's a mistake in the entry. The
17 next entry is telephone to Mr. Andrews. I think it
18 was telephone to Andrew Meyer, is what it said. I
19 don't know who Mr. Andrews would be otherwise.
20    Q. I was going to ask.
21    A. I don't know.
22    Q. So you actually spoke to Mr. Meyer that
23 day?
24    A. I think I did.

23

1     Q. Was that in connection with asking about
2  the check?
3     A. Yes.
4     Q. Do you recall what the description
5  telephone to Mr. Fay refers to?
6     A. I don't know if it should be telephone to
7  or telephone from. I'm sure we spoke over where is
8  the check. I think -- I would have thought he would
9  have called me. I don't really remember. I called
10 to get the check. The check was delivered and I
11 brought it down.
12    Q. Now, when you brought the check down, did
13 you participate in any discussion?
14    A. No. I just said hello and handed the check
15 over.
16    Q. So you have no personal knowledge of
17 anything else that happened at that meeting?
18    A. No.
19    Q. What's the next time entry?
20       MR. FRYER: Why don't we mark it.
21       (Marked, Exhibit 6, time entries.)
22    Q. On the invoice that's part of Exhibit 6,
23 are there any other time entries reflecting time
24 billed by you?

24

1     A. I see a July 14 entry of one-tenth of an
2  hour, which is the minimum entry you can do under
3  this system. It says review correspondence.
4     Q. Any idea what that correspondence refers
5  to?
6     A. No. I often do that when I've got like six
7  letters. I write down review correspondence.
8  Sometimes it is just one letter. I don't know.
9     Q. Now, if you look at the cover letter that's
10 the first page of Exhibit 6, you notice that it
11 indicates that a copy of this went to you?
12    A. I see that.
13    Q. Do you have a memory of seeing this letter
14 in or about December of 1999?
15    A. No.
16    Q. Do you notice that in the next to the last
17 paragraph of the letter it indicates that Mr. Fay,
18 the author of the letter, is expecting to see
19 Mr. Burns on January 10th to discuss creation of a
20 special needs trust for Alexis?
21    A. I see that's what it says.
22       MR. FACHER: "And permanent management
23 of the funds."
24    Q. Do you remember noticing that?

25

1     A. No.
2     Q. At any time before you became aware of this
3  lawsuit, do you remember any awareness of a special
4  needs trust or any kind of trust being considered or
5  discussed in connection with the Burns matter?
6     A. I remember that Mr. Fay told me that they
7  had created some sort of a trust. I didn't know
8  that it was a special needs trust. As I say, I'm
9  not sure I know what a special needs trust is. And
10 that he was having difficulty getting Mr. Burns to
11 sign it.
12    Q. Do you have any memory of when Mr. Fay told
13 you that?
14    A. No.
15    Q. Did you have any further discussion with
16 Mr. Fay beyond his telling you that?
17    A. No. This was passing by the hallway or at
18 lunch. I was not involved in it at all.
19    Q. You didn't ask questions about what was the
20 problem, why wasn't he signing it, anything of that
21 sort?
22    A. No.
23    Q. If a client is being billed by your firm
24 for a matter in which you have billed any time,

John Fabiano
Volume 1 - August 1, 2006

---

**46**

1  before this lawsuit started?

2  A. No, I don't believe so.

3  Q. Do you know what the Office of Public

4  Guardian is, the plaintiff in this case?

5  A. Only from having heard about it in

6  connection with this lawsuit.

7  Q. Did you become aware sometime in September

8  2003 that the Office of Public Guardian had been

9  appointed as guardian for Alexis Burns?

10  A. I don't remember when I became aware of

11  that. I learned that that was so.

12  Q. Did you learn that before you became aware

13  of this lawsuit?

14  A. I think so.

15  Q. Do you recall how you became aware of that?

16  A. My partner Mike Heyison told me.

17  Q. What did Mr. Heyison tell you?

18  MR. FACHER: Objection. That's probably

19  privileged. Mr. Heyison was acting as counsel in

20  that capacity. I don't have the date firmly in

21  mind.

22  THE WITNESS: I don't either, to be

23  honest.

24  MR. FACHER: This is after the public

---

**47**

1  guardian demanded the files and made a claim?

2  MR. FRYER: As you know, the Office of

3  Public Guardian was appointed as guardian for the

4  estate of Alexis in 2003.

5  MR. FACHER: Yes. This was when, do you

6  think?

7  MR. FRYER: But this lawsuit was

8  initiated well after that. And there was

9  substantial communications between the Office of

10  Public Guardian and Mr. Heyison and you back in the

11  2003 time frame.

12  MR. FACHER: You are correct. He can

13  answer. That's all right. You are correct.

14  THE WITNESS: I don't have the question.

15  MR. FRYER: Can you read back the

16  question.

17  (Question read by the reporter.)

18  A. My memory is that he told me that the

19  Office of Public Guardian had contacted him about

20  the Alexis Burns matter. I think he asked me if I

21  had any files.

22  Q. Do you have any memory as to when that

23  conversation with Mr. Heyison took place?

24  A. I do not. I believe it was before the

---

**48**

1  lawsuit was filed.

2  Q. What was your response to Mr. Heyison?

3  A. I'm sure I said I'll look to see if I have

4  any files.

5  Q. And did you find any files?

6  A. Whatever you have there, those handwritten

7  notes came from whatever file I had.

8  Q. So you had kept those in your office or in

9  your own files until Mr. Heyison asked you for

10  documents?

11  A. That's correct.

12  Q. By the way, do you recall any notes that

13  you found other than the ones that we've already

14  marked as exhibits?

15  A. No. I'm not much of a note-taker.

16  Q. So there were just notes for those two

17  occasions?

18  A. Yes.

19  Q. After that request from Mr. Heyison for any

20  documents or files that you had relating to the

21  Burns matter, when did you next have any

22  conversation with anyone at your firm or Haldor

23  concerning the Burns matter?

24  A. I can't give you the date. I spoke to

---

**49**

1  Mr. Facher and Mr. Heyison on later occasions.

2  Q. Was that after the lawsuit had been filed?

3  A. I believe so.

4  Q. So between the time that the lawsuit was

5  filed and the earlier time when Mr. Heyison asked

6  you if you had any documents relating to the matter,

7  in between those two occasions, did you have any

8  conversation with anyone else at your firm or Haldor

9  concerning the Burns matter?

10  A. No.

11  Q. When Mr. Heyison asked you if you had any

12  files, did he tell you anything else about the

13  status of the matter?

14  A. I don't remember anything else. And I'm

15  not sure I even remembered who the Burns family was.

16  Q. Did you have any discussion about who the

17  Office of Public Guardian was?

18  A. I think he explained the function of the

19  Office of Public Guardian, because it is not a term

20  I would have known.

21  Q. Do you remember anything else about that

22  conversation?

23  A. I thought at some point, it may have been

24  in that conversation, that somebody told me that

---

Exhibits:  52-61                    Volume 1, Pages 1-207

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - -

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

Plaintiff

vs.                     Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

Defendants

- - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF MICHAEL L. FAY

Thursday, August 10, 2006, 10:10 a.m.

Wilmer Cutler Pickering Hale and Dorr LLP

60 State Street

Boston, Massachusetts

- - - - - - - Reporter:  Susan J. Blatt, RPR - - - - - - -

sblatt@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404   fax 617.728.4403

Michael L. Fay
Volume 1 - August 10, 2006

22

1    Q. And did you have an understanding as to
2 whether those amounts would have to be repaid out of
3 the judgment?
4    A. Yes.
5    Q. It was your understanding that they would
6 have to be repaid out of the judgment?
7        MR. FACHER: Object to the form.
8    A. Yes.
9    Q. And it was your understanding based on your
10 conversation with Mr. Burns?
11    A. No.
12    Q. What's the basis for your understanding?
13    A. My understanding of the applicable law.
14    Q. So was it the case that Mr. Burns told you
15 in this phone call that there was 30 to 40 thousand
16 in Medicaid expenses that had been incurred in
17 connection with Alexis's treatment?
18    A. Yes.
19        MR. FACHER: I'm sorry. I object to the
20 form. I think you said "Medicaid expenses that had
21 been incurred"? I know what you mean, but I don't
22 know that the question was clear. Medicaid payments
23 that had been made? You can leave it the way it is.
24    Q. Well, what exactly did Mr. Burns tell you

23

1 about Medicaid amounts?
2    A. That Medicaid had paid amounts, medical
3 expenses on behalf of Alexis in the range of 30 to
4 40 thousand dollars.
5    Q. And from that, it was your assumption that
6 those amounts would have to be repaid out of the
7 judgment. Is that right?
8    A. It was my understanding that those amounts
9 would be properly recovered from Alexis's assets by
10 the Medicaid authorities.
11    Q. But that was your conclusion and not what
12 Mr. Burns had told you. Is that right?
13    A. Correct.
14    Q. And from your phone call with David Burns
15 on May 20, you understood that David was not married
16 to Alexis's mother?
17    A. Correct.
18    Q. And was it your understanding from that
19 conversation that David Burns had custody of Alexis
20 and his other two daughters?
21    A. I don't know whether the other two children
22 were sons or daughters, but it was my understanding
23 that he had custody of the three children.
24    Q. Did you know whether his having custody was

24

1 temporary custody or permanent custody?
2    A. I did not know.
3    Q. Let me show you Exhibit 6 from Mr.
4 Fabiano's deposition.
5        THE WITNESS: Do I return this to you?
6        MR. FRYER: Let me mark your notes as an
7 exhibit.
8        (Marked, Exhibit 52, handwritten notes,
9 5/20/99.)
10    Q. We've got your notes marked as Exhibit 52.
11 Now, let me show you Exhibit 6 from Mr. Fabiano's
12 deposition. You had mentioned earlier that you had
13 looked at some billing records. Is this one of the
14 billing records that you looked at?
15    A. Yes.
16    Q. Is this a bill to Mr. Burns for legal
17 services provided from the beginning of the matter
18 through December 28, 1999?
19    A. Yes.
20    Q. There is a reference in the detail entries
21 to your conversation, telephone conversation with
22 Mr. Burns on May 20th?
23    A. Yes.
24    Q. Now, there's one entry before that that's

25

1 for Mr. Megan, correct?
2    A. Yes.
3    Q. And it indicates that he met with you and
4 then worked on drafting a trust?
5    A. Yes.
6    Q. Now, the entry for your time on May 20th,
7 the first part of the description says "telephone
8 from Mr. Burns re: daughter's trust," right?
9    A. Yes.
10    Q. What's the daughter's trust that that
11 refers to?
12    A. It's a reference to the recommendation I
13 made to Mr. Burns that his daughter would benefit
14 from creation of a special needs trust to which the
15 funds awarded would be contributed.
16    Q. Did you have an understanding at that point
17 as to whether Mr. Burns had had any discussions
18 about the establishment of the trust with Mr. Meyer?
19    A. I did not have any understanding one way or
20 the other.
21    Q. Is it your memory that it was you that
22 raised the issue of a trust for Alexis with Mr.
23 Burns?
24    A. I don't recall.

FARMER ARSENAULT BROCK LLC

Michael L. Fay
Volume 1 - August 10, 2006

30

1    Q. It begins on page 3. Do you see at the
2  very beginning of the answer it states that, quote,
3  "Defendant Hale and Dorr LLP was retained by David
4  Burns on or about May 24th, 1999 following a meeting
5  among David Burns, Michael Fay, and David Megan."
6  Do you see that?
7    A. Yes.
8    Q. Now, if you look back at Exhibit 6, the
9  billing record, on the first page of the exhibit,
10  which is a covering letter -- do you see that?
11    A. Yes.
12    Q. Do you see in the first sentence of that
13  letter it refers to the initiation of our services
14  on May 20th, 1999?
15    A. Yes.
16    Q. And as we saw, your first time entries are
17  on May 20th, correct?
18    A. Yes.
19    Q. In light of the information shown on the
20  billing record that's Exhibit 6, is that portion of
21  the answer to the first interrogatory that I just
22  referred to, is that accurate?
23    A. Yes.
24    Q. So even though you began working on the

31

1  matter and billing for the matter on May 20th, is it
2  your testimony that you did not actually get
3  retained by Mr. Burns until May 24th?
4    MR. FACHER: Object to the form.
5    A. The interrogatory says on or about May 24.
6  It doesn't say just May 24.
7    Q. What's your understanding as of today as to
8  when your firm began to represent Mr. Burns?
9    A. May 20th.
10    Q. Had you not looked at billing records at
11  the time the answers to interrogatories were
12  prepared?
13    A. I'm sure I had.
14    Q. Now, back to the billing record, Exhibit 6,
15  on your time entry for May 20th, where you refer to
16  the telephone call Mr. Burns re: daughter's trust.
17  The daughter referred to there is Alexis. Is that
18  right?
19    A. Yes.
20    Q. And the discussion that that refers to was
21  in part about establishing a trust for the benefit
22  of Alexis; is that correct?
23    A. Yes.
24    Q. And specifically was the discussion about

32

1  establishing a special needs trust?
2    A. Yes.
3    Q. Now, did you have any discussion during
4  that phone call with Mr. Burns on May 20th about any
5  of the issues that arise in connection with a
6  special needs trust?
7    A. I don't recall.
8    Q. But when you spoke with Mr. Burns on May
9  20th, did you have any reason to believe that Mr.
10  Burns had an understanding of what a special needs
11  trust was?
12    A. Only -- yes.
13    Q. And what led you to believe that he
14  understood what a special needs trust was?
15    A. From my description of such a trust in our
16  conversation.
17    Q. Do you have any memory of what you told him
18  when describing a special needs trust?
19    A. I have no specific recollection.
20    Q. Do you have any general recollection of
21  what you told him?
22    A. I would have told him that such a trust
23  would be created to allow his daughter Alexis to
24  remain eligible for Medicaid assistance during the

33

1  balance of her lifetime despite the existence of the
2  funds awarded in the litigation as a result of which
3  $2.2 million was payable, and that the two principal
4  requirements of such a trust or such an arrangement,
5  I should say, were first that funds previously
6  advanced by Medicaid authorities would be repaid,
7  and that funds, if any, remaining in the trust upon
8  the death of Alexis would have to be used first to
9  repay Medicaid for any subsequently -- any expenses
10  subsequently defrayed by Medicaid authorities.
11  Those are the key elements of a special needs trust;
12  and of course the trust would be exclusively held
13  for the benefit of Alexis.
14    Q. So it's your understanding in that May 20th
15  conversation with Mr. Burns you would have told him
16  in part that after repaying amounts that had already
17  been paid on Alexis's behalf by Medicaid, that
18  remaining dollars would have to be used first to pay
19  any additional Medicaid expenses; is that correct?
20    A. It's correct upon the death of Alexis.
21    Q. And would you have discussed how -- let me
22  ask it this way. In that conversation with Mr.
23  Burns on May 20th, would you have had any further
24  discussion of how the funds remaining for Alexis

30 (Pages 114 to 117)

Michael L. Fay
Volume 1 - August 10, 2006

114

1    Exhibit 6, when you indicate a telephone call to
2    someone, can you tell from your entry whether you
3    actually reached the person or not?
4        A.  No.
5        Q.  Was it your practice to indicate that you
6    had tried to reach someone by placing a phone call,
7    even if you didn't get an answer on the other end?
8        A.  Typically only if I had left a message.  If
9    I called a number and it just rang, I would not
10   record it; if I called someone and got a voice mail,
11   I would record it.
12       Q.  From your time entries on the bill, you
13   can't tell when you telephoned to someone if you
14   left a message or actually spoke with someone?
15       A.  That's correct.
16       Q.  Is there any way to tell from any of the
17   documents you looked at when after July 14, 1999 you
18   actually spoke next with Mr. Burns?
19       A.  Yes.
20       Q.  And how can you tell that?
21       A.  On November 3, 1999 Mr. Burns -- oh, I'm
22   sorry.  There's an entry on November 3rd, it says
23   "Telephone from David," and I can't be sure that
24   that's David Burns or David Megan.  Ordinarily,

115

1    however, I would refer to Mr. Megan as Mr. Megan.
2        Q.  Is it your belief that's a reference to Mr.
3    Burns?
4        A.  Yes.  I expect it is, but I can't be
5    positive.
6        Q.  Do you have any memory of what you
7    discussed with Mr. Burns on November 3, 1999?
8        A.  No.
9        Q.  The next day, November 4th, there's an
10   entry for telephone calls from and to Jeff Anthony,
11   correct?
12       A.  Yes.
13       Q.  Do you have any memory of what you
14   discussed with Mr. Anthony --
15       A.  No.
16       Q.  -- that day?  At some point in the process
17   of working on the Burns matter, did you reach a
18   point where you had concerns about getting the trust
19   executed?
20       A.  Could you tell me what you mean by that,
21   what kind of concerns I had?  I'm a little hazy on
22   that.
23       Q.  The trust that was prepared for the Burns
24   matter was never actually executed, correct?

116

1        A.  That's correct.
2        Q.  And your firm was involved in the Burns
3    matter until the middle of 2003, correct?
4        A.  I don't remember how long, but that sounds
5    right.
6        Q.  So that's about four years from the time
7    Mr. Burns first came to you?
8        A.  Yes.
9        Q.  At some point in that five-year time frame,
10   did you begin to consider that there was a problem
11   by virtue of the fact that the trust for the Burns
12   matter had not been executed?
13       A.  The only possible problem was that Alexis
14   would remain disqualified for Medicaid payments or
15   other need-based payments.
16       Q.  Did you discuss that issue with Mr. Burns
17   at any time in that four-year period?
18       A.  Whenever I called or wrote to him to
19   discuss executing the -- whenever I called him to
20   discuss executing the document, I would from time to
21   time remind him of the reasons for having the
22   document, which would include requalification of
23   Alexis for Medicaid or other benefits.
24       Q.  Do you have a memory of approximately how

117

1    many times you spoke with Mr. Burns to encourage him
2    to come down to your offices in order to execute the
3    trust?
4        A.  Could I ask for a clarification?  By
5    speaking to him, do you mean actually having --
6    talking with him, or do you mean including phone
7    messages left for him?
8        Q.  Well, if you left messages for him, you
9    couldn't know for sure whether he got them unless he
10   called you back, correct?
11       A.  That's correct.
12       Q.  What I'd really like to know is how many
13   times you actually spoke with Mr. Burns in
14   attempting to get him to come to your office to
15   execute the trust?
16       A.  I'd have to reconsult the time records and
17   the interrogatory answer.  I believe they're listed
18   in the interrogatory answer.
19       Q.  Do you have a memory of approximately how
20   many times you spoke to him about that?
21       A.  I can't recall specifically how many times
22   I actually reached him and how many times I left
23   messages.
24       Q.  At any time during the four-year period

Exhibits:  122-143        Volume 1, Pages 1-118

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - - - - - - - - - - - -

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

Plaintiff

vs.                  Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF MICHAEL R. HEYISON

Monday, September 11, 2006, 11:05 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts


- - - - - - - Reporter:  Susan J. Blatt, RPR - - - - - - -

sblatt@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404   fax 617.728.4403

2 (Pages 2 to 5)

Michael R. Heyison
Volume 1 - September 11, 2006

---

**Page 2**

1  APPEARANCES:
2  Badger, Dolan, Parker & Cohen
3    R. Alan Fryer, Esq.
4    Dorothy M. Bickford, Esq.
5    One State Street, Suite 600
6    Boston, Massachusetts 02109
7    617.482.3030  fax: 617.482.6919
8    afryer@badgerlaw.com
9    for Plaintiff
10
11  Wilmer Cutler Pickering Hale and Dorr LLP
12    Jerome P. Facher, Esq.
13    Mary B. Strother, Esq.
14    60 State Street
15    Boston, Massachusetts 02109
16    617.526.6000  fax: 617.526.5000
17    jerome.facher@wilmerhale.com
18    for Defendants
19
20  John MacIntosh, P.C.
21    24 Montgomery Street
22    Concord, New Hampshire 03301
23    603.225.1188
24    for Office of Public Guardian

---

**Page 4**

1  Pickering Hale and Dorr?
2    A. LLP, yes.
3    Q. Were you an attorney with Hale and Dorr
4  before that?
5    A. Yes, I was. Hale and Dorr LLP.
6    Q. When did you first join Hale and Dorr?
7    A. September of 1982.
8    Q. Was that your first job after law school?
9    A. Yes, it was.
10    Q. And you've been with the firm in one
11  incarnation of the firm or another since. Is that
12  right?
13    A. I've been with Hale and Dorr and then
14  WilmerHale.
15    Q. Is WilmerHale a d/b/a for Wilmer Cutler
16  Pickering Hale and Dorr?
17    A. I don't know whether it is officially a
18  d/b/a, but that is the trade name that we are using
19  to shorten Wilmer Cutler Pickering Hale and Dorr.
20    Q. That rolls off the tongue a little easier
21  than the full name?
22    A. For some.
23    Q. And what kind of law practice do you have?
24    A. I'm a litigator.

---

**Page 3**

1        PROCEEDINGS
2        MICHAEL R. HEYISON, sworn
3        EXAMINATION
4  BY MR. FRYER:
5    Q. Would you state your full name for the
6  record, please.
7    A. Michael Recht, R-e-c-h-t, Heyison,
8  H-e-y-i-s-o-n.
9    Q. Now, what's your date of birth?
10    A. 3/11/57.
11    Q. And you're an attorney?
12    A. Yes, I am.
13    Q. And where did you go to college?
14    A. Yale.
15    Q. When did you graduate?
16    A. 1979.
17    Q. And where did you go to law school?
18    A. Harvard Law.
19    Q. When did you graduate from there?
20    A. 1982.
21    Q. Have you had any other postgraduate
22  education?
23    A. No.
24    Q. You're an attorney at Wilmer Cutler

---

**Page 5**

1    Q. And so you're familiar with the deposition
2  process?
3    A. Yes, I am.
4    Q. And you understand that we can take a break
5  at any time if you feel the need to do so?
6    A. Yes.
7    Q. Now, do you also have responsibilities with
8  your firm in the nature of being risk management
9  partner?
10    A. I'm general counsel to the firm and risk
11  management partner.
12    Q. What's the nature of the position as risk
13  management partner?
14    A. The nature of the position is handling
15  claims against the firm, providing legal advice to
16  the firm, reviewing, drafting, proposing firm
17  procedures, providing ethics-related advice to the
18  firm's lawyers and management. There may be other
19  responsibilities, but they're not coming to mind
20  right now.
21    Q. As risk management partner, is there a
22  person or group in the firm that you report to?
23    A. I report to the firm management, which I
24  would consider to be, for this purpose, the

---

Michael R. Heyison
Volume 1 - September 11, 2006

---

**38**

1  complaint?

2      A. Yes. It's been some time since I read the

3  complaint, but I do understand that they claim that

4  those funds were to be used for Alexis Burns'

5  benefit.

6      Q. And that the defendants were legally

7  responsible as a result of allowing Mr. Burns to use

8  those funds for the benefit of someone other than

9  Alexis. Do you understand that?

10      MR. FACHER: Object.

11      A. Yes, I understand that's the claim.

12      MR. FACHER: That was only half a

13  sentence, that's why I objected.

14      Q. Do you understand that it's the defendants'

15  position that they have not in any way mishandled

16  those funds?

17      A. It's my understanding that the defendants'

18  position is that they have not mishandled funds and

19  they have not breached any duties.

20      Q. And is it your understanding that the

21  defendants' position is that their client was David

22  Burns and not Alexis?

23      A. Well, it's my understanding that Hale and

24  Dorr and WilmerHale have identified Mr. Burns as

---

**39**

1  their client. It's also my understanding that

2  Haldor, Hale and Dorr Capital Management has

3  identified Mr. Burns as the owner or holder of the

4  agency account that was opened at Haldor. Can I

5  refer to Haldor so I don't have to use both names,

6  and Hale and Dorr, if that's okay with you?

7      Q. It's fine with me. So is it your

8  understanding that it's the position of the

9  defendants that because David Burns was the client

10  that it was his instructions that the defendants

11  were obligated to comply with?

12      MR. FACHER: Object to the form. I

13  don't think it's useful in a deposition to argue

14  contentions back and forth. I'm not going to

15  instruct him not to answer, but it doesn't serve

16  much of a purpose to have a debate over who is

17  contending what. You can answer if you want to.

18      A. It's my understanding that the defendants'

19  position is that Mr. Burns was responsible for any

20  misuse of the funds, breached his duty to Alexis as

21  a father and whatever capacity he was in, including

22  the fact that he had custody or guardianship of his

23  daughter, and that he is the person who is

24  responsible for the misuse of the funds.

---

**40**

1      Q. Well, if Mr. Burns, as you understood it,

2  was the person who had control of the funds, why

3  would the manner in which he used those funds give

4  you any reason to think that there might be a claim

5  made against the defendants?

6      MR. FACHER: Object to the form.

7      A. Because we were receiving telephone calls

8  from a chief of police, told the Attorney General

9  was investigating; about this time I received a

10  call, I believe from somebody who had been

11  identified as a guardian; and any situation where

12  there's a claim that money was misused and somebody

13  either was holding money or was involved in any way,

14  there's always the potential for a claim to be made,

15  whether there is any merit to it from our

16  perspective or not; which is why people call me when

17  they receive calls like this from chiefs of police

18  or anybody else.

19      Q. You mentioned a minute ago that you got a

20  phone call from someone who was the guardian of

21  Alexis; is that correct?

22      A. Yes. Somebody who identified herself as

23  the guardian. Now, what I don't remember is whether

24  I first got a piece of correspondence and then spoke

---

**41**

1  with her or I got the call first and then got the

2  correspondence, but I do know that I got -- that I

3  had a telephone call, and that I believe I got a

4  letter.

5      Q. Was that person you spoke with named Lynn

6  Aaby, A-a-b-y?

7      A. I believe it was.

8      Q. Now, at the time you first learned about

9  the Burns matter, did you have any responsibilities

10  as risk management partner that related to Hale and

11  Dorr Capital Management?

12      MR. FACHER: Object to the form.

13      Q. Let me ask it this way. Did your duties as

14  risk management partner for Hale and Dorr include

15  any responsibilities with respect to Hale and Dorr

16  Capital Management?

17      A. I would say no, but from time to time

18  Haldor and then Hale and Dorr Capital Management

19  would call me for legal advice, and Hale and Dorr

20  provided legal advice to Haldor and then Hale and

21  Dorr Capital Management. When they needed legal

22  advice, I would receive phone calls from Haldor

23  requesting me to provide legal advice.

24      Q. Well, when Haldor sought legal advice, were

---

Exhibits:  37 - 51          Volume 1, Pages 1 - 173

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

Plaintiff

vs.                 Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -


DEPOSITION OF DAVID MEGAN

Tuesday, August 8, 2006, 10:04 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts


- - - - - - - Reporter:  David A. Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404   fax 617.728.4403

David Megan
Volume 1 - August 8, 2006

---

166

1  Q. Did Mr. Burns have the right to approve or
2  disapprove any and all terms of trusts that were
3  sent to him?
4  A. Yes.
5  Q. And as of the last trust that was sent to
6  him, were there still matters that had not been
7  determined by him?
8  A. Yes.
9  MR. FACHER: That's all I have.
10  EXAMINATION
11  BY MR. FRYER:
12  Q. Mr. Megan, when did your firm last handle
13  the administration of a (d)(4)(A) trust?
14  A. I should add to my knowledge we don't have
15  any. And I would estimate about a year and a half
16  ago, a year ago.
17  Q. Has your firm made a decision not to handle
18  the administration of (d)(4)(A) trusts?
19  MR. FACHER: I object to the form.
20  A. I don't know if the firm has made that
21  decision.
22  Q. Now, when you say that the client was David
23  Burns, what's your basis for saying that?
24  A. That was my understanding throughout and

---

167

1  from conversations with Mr. Fay that we were going
2  to prepare a draft and that the draft would be for
3  Mr. Burns.
4  Q. Well, other than the conversation you
5  described with Mr. Fay, what's the basis of your
6  understanding that Mr. Burns was the client of the
7  firm?
8  A. My general understanding that he was the
9  client, he was the person who had come to the firm
10  and that we had been asked to prepare a draft of the
11  trust for him.
12  Q. Did you ever see the check that was
13  delivered to your firm that represented the proceeds
14  recovered from the medical malpractice case on
15  behalf of Alexis?
16  A. I don't believe I ever saw that.
17  Q. Did anyone ever tell you that the check
18  representing the proceeds of Alexis's medical
19  malpractice case was payable to David Burns,
20  trustee?
21  A. I never knew that.
22  Q. Are you aware of any trust that Mr. Burns
23  was a trustee of?
24  A. I'm not aware of any trusts, no.

---

168

1  Q. Would it make a difference in your mind
2  concerning Mr. Burns's authority to exercise control
3  over the medical malpractice proceeds that the check
4  was payable to him as trustee rather than to him
5  individually?
6  MR. FACHER: Objection to the form.
7  A. No.
8  Q. Is it your understanding that Mr. Burns had
9  the authority as an individual to endorse a check
10  payable to himself as trustee?
11  MR. FACHER: I object to the form.
12  A. I don't know.
13  Q. What's the basis for your understanding
14  that Mr. Burns was the person who had the authority
15  to approve the terms of any trust that was
16  established?
17  A. My understanding is based on the fact that
18  he was the client and he was the person who in a
19  general sense had come from Lubin & Meyer to the
20  firm and he was the person who had the money.
21  Q. Okay.
22  MR. FRYER: That's all I have.
23
24

---

169

1  EXAMINATION
2  BY MR. FACHER:
3  Q. Was the case opened with Mr. Burns as the
4  client, if you know?
5  A. I don't know.
6  Q. And was Mr. Burns the person to whom the
7  case was billed?
8  A. Yes.
9  Q. And was the name of the case Alexis Burns
10  Trust?
11  A. I'm not sure.
12  MR. FACHER: Fair enough. Subject to my
13  reporting to you.
14  MR. FRYER: We will suspend allowing for
15  the possibility that if you find documents there may
16  be additional questions.
17  MR. FACHER: We have already done the
18  search you asked about electronic versions and do
19  not have any, other than what's been produced here.
20  However, I will keep my commitment to make a search
21  for the physical documents if they exist.
22  MR. FRYER: Thank you.
23  MR. FACHER: Thank you.
24  MR. FRYER: That's it. (5:43 p.m.)

Exhibits:  98-104                    Volume 1, Pages 1-87

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

Plaintiff

vs.                    Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -


DEPOSITION OF ANDREW C. MEYER, JR.

Tuesday, August 29, 2006, 10:07 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts


- - - - - - - Reporter:  Susan J. Blatt, RPR - - - - - - -

sblatt@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404   fax 617.728.4403

3 (Pages 6 to 9)

Andrew C. Meyer, Jr.
Volume 1 - August 29, 2006

6

1    Q. Could you describe who the parties were in
2  that case?
3    A. I believe the parties, as best as I recall,
4  originally were the parents as well as Alexis, and I
5  believe the parents' claims were dropped just prior
6  to trial and the claims were brought on behalf of
7  Alexis only.
8    Q. Do you recall the names of the parents?
9    A. Bonnie, the mom -- I just saw it. Give me
10  one second and I'll tell you exactly. David Burns,
11  Bonnie Davis and David Burns.
12    Q. Did you have an understanding as to whether
13  Bonnie Davis and David Burns were married?
14    A. I don't believe so. At this -- I'm sure I
15  did at the time. I don't remember right now whether
16  they were married at the time of the trial.
17    Q. What was the nature of the case that you
18  brought on behalf of Alexis Burns?
19    A. It was a case involving adverse events
20  happening at the time at or around her birth
21  depriving her -- the plaintiff of oxygen, resulting
22  in some degree of brain damage.
23    Q. What was the diagnosis that resulted from
24  that?

7

1    A. Cerebral palsy.
2    Q. Do you recall when that suit was filed?
3    A. I do not.
4    Q. Do you recall how old Alexis was when the
5  suit was filed?
6    A. Not off the top of my head.
7    Q. There is a procedure that you -- well, let
8  me ask you this. Was Alexis a minor child at the
9  time you were handling the case?
10    A. Yes, she was.
11    Q. Is there a procedure that you follow in
12  bringing suit on behalf of a minor child?
13    A. Yes, there is.
14    Q. What is that?
15    A. It has to be brought by a parent on behalf
16  of the minor child.
17    Q. And how do you name the parties in that
18  situation?
19    A. It's brought as a parent PPA, it's called
20  PPA, per prochein ami, excuse my French, on behalf
21  of that child, and that's the way it's named.
22    Q. Is that sometimes referred to as the next
23  friend of the plaintiff?
24    A. Yes, I think that's what the translation

8

1  is.
2    Q. Now, do you recall who was named as next
3  friend for Alexis in the medical malpractice case?
4    A. I believe it was Bonnie Davis. I have
5  David Burns. I'm sorry.
6    Q. What are you referring to?
7    A. I'm going through a ...
8    Q. What are you referring to?
9    A. I'm referring to a document which is the
10  closing papers that we have, which is the settlement
11  distribution sheet signed at that point by David
12  Burns individually as father and next friend of
13  Alexis.
14    MR. FRYER:  Let me mark this as an
15  exhibit.
16    (Marked, Exhibit 98, complaint.)
17    Q. Can you identify Exhibit 98?
18    A. It appears to be a complaint filed by
19  Alexis Burns by her mother, Bonnie Davis, against
20  the defendants.
21    Q. Is that the complaint that you filed to
22  initiate the medical malpractice case?
23    A. Yes, it appears to be.
24    Q. And does the exhibit indicate that the

9

1  complaint was filed in 1992?
2    A. It does.
3    Q. And who is named in the complaint as the
4  next friend for Alexis Burns?
5    A. Bonnie Davis.
6    Q. Is David Burns named in the complaint as
7  next friend for Alexis?
8    A. Not by caption. I don't believe it would
9  be any other way.
10    Q. Now, does the caption indicate also that
11  Bonnie Davis has been named as next friend for
12  Alexis Burns?
13    A. It does.
14    Q. Was there a reason for naming Bonnie Davis
15  for next friend as Alexis rather than David Burns?
16    A. Generally we just bring the action on
17  behalf of the mom. It really is just a title in
18  name only.
19    Q. Now, do you recall whether at any point
20  during the medical malpractice lawsuit you ever
21  changed the parties to designate David Burns as next
22  friend for Alexis?
23    A. I don't remember that. I'm not saying I
24  didn't. I just don't recall whether we did or

FARMER ARSENAULT BROCK LLC

Andrew C. Meyer, Jr.
Volume 1 - August 29, 2006

**14**

1    (Marked, Exhibit 101, special questions
2 to the jury.)
3    Q.  Let me show you Exhibit 101.  Is that the
4 verdict slip or special questions that were returned
5 by the jury in your case?
6    A.  It appears to be.
7    Q.  Does this indicate that the jury found two
8 of the defendants liable?
9    A.  Yes, it does.
10    Q.  Does it also indicate what damages the jury
11 awarded to Alexis?
12    A.  It does.
13    Q.  What damages were awarded?
14    A.  $1,300,000, $50,000 -- total damages for
15 Alexis was 1.7 million.
16    Q.  Does that include 1,300,000 for future lost
17 earning capacity?
18    A.  It does.
19    Q.  And does it include $50,000 for past pain
20 and suffering?
21    A.  It does.
22    Q.  And does it include 350,000 for future pain
23 and suffering?
24    A.  It does.

**15**

1    Q.  And who were those damages awarded to?
2    A.  Alexis.
3    Q.  And you testified earlier that before the
4 case went to a verdict, the claims on behalf of
5 Alexis's parents were dropped.  Is that right?
6    A.  I believe so, yes.
7    Q.  Was there an appeal?
8    A.  There was, I believe there was a motion for
9 a new trial and the case was settled after that
10 motion was decided.  I do not believe the case ever
11 went up on appeal.
12    Q.  Memories are a wonderful thing.
13    A.  Did they appeal it?
14    Q.  Let me show you Exhibit 14.  Is that a
15 decision from the Appeals Court in your case?
16    A.  I guess it was appealed.  Never gave up.
17 Apparently it was appealed.
18    Q.  Let me show you Exhibit 15.  Can you
19 identify that?
20    A.  It's a decision on appeal.
21    Q.  Is that the docket entry showing the entry
22 of a final judgment in the case?
23    A.  It appears to be.
24    Q.  What's the date of that?

**16**

1    A.  4th day of May 1999.
2    MR. FRYER:  Let's mark this as an
3 exhibit.
4    (Marked, Exhibit 102, copy of check.)
5    Q.  Let me show you Exhibit 102.  Can you
6 identify that?
7    A.  It appears to be a check in payment of the
8 verdict plus interest.
9    Q.  That's the check that you received in
10 payment of the verdict that was awarded to Alexis
11 Burns?
12    A.  Yes.
13    Q.  That's for more than 1.7 million, correct?
14    A.  Correct.
15    Q.  What does that total amount of the check
16 represent?
17    A.  Interest which is added to the verdict.
18    Q.  What's the amount of the check?
19    A.  3,355,269.44.
20    Q.  And who is the check payable to?
21    A.  Alexis Burns by her parent and next friend
22 Bonnie Davis and her attorney Andrew Meyer.
23    Q.  Now, is that the amount that Alexis Burns
24 actually received from the case?

**17**

1    A.  No.
2    Q.  What caused Alexis to receive an amount
3 different than what's shown on this check?
4    MR. HEYISON:  Object to the form.
5    A.  There was a charge for legal fees and
6 expenses which are deducted from this.
7    MR. FRYER:  Can you mark this, please.
8    (Marked, Exhibit 103, list of expenses.)
9    Q.  Let me show you Exhibit 103.  Is that a
10 list of expenses that was prepared by your office in
11 connection with the Burns case?
12    A.  Yes, it is.
13    Q.  Does that list all of the expenses other
14 than attorneys' fees that were deducted from the
15 recovery for Alexis?
16    A.  Yes.
17    Q.  Let me show you Exhibit 47.  Do you see
18 that's a fax from your office to Hale and Dorr?
19    A.  Yes, it is.
20    Q.  And can you identify the two pages that are
21 attached to the fax cover sheet?
22    A.  It appears to be what we call a settlement
23 distribution sheet outlining fees and expenses
24 deducted from the amount of the settlement or