UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXIS J. BURNS by and through her legal guardian, OFFICE OF PUBLIC GUARDIAN<br>    Plaintiff<br><br>v.<br><br>HALE AND DORR LLP, et al.,<br>    Defendants | CIVIL ACTION NO. 05-11113NMG |

**AFFIDAVIT OF R. ALAN FRYER IN SUPPORT OF
MOTION FOR LEAVE TO FILE MEMORANDUM**

I, R. Alan Fryer, hereby depose under oath and state that:

1.      I am counsel for the Office of Public Guardian (OPG") as guardian of Alexis J. Burns ("Alexis") in this action.  This affidavit is being submitted with the Motion for Leave to File Memorandum in Support of Motion to Further Amend.

2.      On behalf of OPG, I recently filed a Motion for Leave to Further Amend Complaint [Docket No. 22] ("Motion to Amend").  In the Motion to Amend, OPG seeks leave to amend its complaint by adding claims for conversion and breach of contract against the Defendants.  OPG does not seek to add additional parties.  Nor does it seek to allege any additional facts that would require the parties to conduct further discovery.

**Good Cause Exists**

3.      As explained in detail below, good cause exists for OPG to amend the complaint after the deadline set forth in the Court's scheduling order, because OPG discovered the facts upon which its proposed claims are based only when it recently took certain depositions.  Those

facts were not known to OPG at the time of the deadline for amending the pleadings (which was proposed jointly by the parties and approved by the Court in its scheduling order).

4.    The newly discovered evidence relates to the circumstances under which Andrew C. Meyer, Jr., Esquire ("Meyer"), as Alexis's attorney in her medical malpractice case, engaged the services of the Defendants and delivered the net proceeds from the malpractice case to them. Meyer received payment of the judgment on behalf of Alexis in May 1999.  In anticipation of the payment, Meyer contacted the Defendants (as he did on behalf of other clients) and obtained their agreement to have Hale and Dorr (now WilmerHale) establish for Alexis a type of trust known as a Special Needs Trust, and to have Haldor (now Hale and Dorr Capital Management) invest the funds in accordance with the instructions of an independent trustee, who was to be appointed pursuant to the terms of the trust.  Meyer then delivered the net proceeds of the malpractice case to the Defendants in the form of a $2,425,949.96 check (the "Check"), together with a covering letter addressed to John G. Fabiano, Esquire (the "Covering Letter").

5.    Before the present lawsuit was commenced, the Defendants had produced documents to OPG's predecessor counsel.  Those documents included a copy of the Covering Letter, but not a copy of the Check.  Nor did the Defendants' documents include any notes of any conversations between Meyer and any representative of the Defendants that clearly described any agreement between them.

6.    Promptly after making its Rule 26 Initial Disclosures, OPG served interrogatories and document requests on the Defendants.  In their February 2006 responses to OPG's document requests, the Defendants produced some additional documents, but those documents did not include a copy of the Check.  Furthermore, in its responses to OPG's interrogatories concerning the Defendants' meetings with Alexis's father, David Burns ("Mr. Burns"), the Defendants

invoked Rule 33(c), rather than providing any description of the circumstances under which the Check was delivered to the Defendants and endorsed by Mr. Burns.

7. In March 2006, OPG served a subpoena on the keeper of the records for Meyer's firm, Lubin & Meyer. In response to that subpoena, Lubin & Meyer produced documents that included a copy of the <u>front</u> side of the Check. However, the documents did <u>not</u> include the back side of the Check and did not include any notes of conversations that Meyer had had with any representatives of the Defendants.

8. As a result, when OPG began taking depositions in August 2006, it still did not know any details concerning the circumstances under which the Defendants' services had been engaged and did not know the circumstances under which the Check had been endorsed and cashed.

9. The only significant information that OPG has been able to obtain about the Defendants' handling of the Check has come from depositions of:

- John G. Fabiano, a WilmerHale attorney, on August 1, 2006;

- Michael L. Fay, a WilmerHale attorney, on August 10, 2006;

- Jeffrey E. Anthony, a former employee of the Defendant Haldor, on August 3, 2006; and

- Andrew C. Meyer, Jr., on August 29, 2006.

10. Fabiano testified at his deposition that: a) he has no memory of any discussions with Meyer concerning the creation of a trust for Alexis (p. 19, lines 6-10); b) he has no memory of thinking about the payee of the Check (p. 20, lines 1-7); and c) he was not present when the Check was endorsed (p. 74, lines 2-4). Attached as <u>Exhibit A</u> is a true copy of relevant portions of the transcript of Fabiano's deposition.

11.    Fay testified at his deposition that:  a) he doesn't remember whether he had any discussions with Meyer about the Burns matter when Meyer was referring the matter to Hale and Dorr (p. 13, lines 2-8); and b) he doesn't recall whether he saw the Check when it was delivered to Fabiano (p. 64, lines 9-13).  Attached as <u>Exhibit B</u> is a true copy of relevant portions of the transcript of Fay's deposition.

12.    Anthony testified at his deposition that:  a) he first saw the Check at the May 27, 1999 meeting with Mr. Burns at Hale and Dorr (p. 50, lines 1-9); b) he presented Mr. Burns with an agency agreement that he had prepared so that an investment account could be opened (p. 44, line 22 – p. 45, line 5; c) the Check was given to him after Mr. Burns had signed the agency agreement (p. 51, lines 13-17); d) the Check was given to him after it had been endorsed, and he looked at the endorsement but doesn't remember the form of the endorsement (p. 51, line 17 – p. 52, line 1); e) he did not have an understanding of what the word "trustee" referred to and did not know whether Mr. Burns was the trustee of any trust (p. 55, line 4-15); and f) he did understand, at the time of the May 27 meeting, that the Check represented funds that had been recovered on behalf of Alexis (p. 59, lines 10-14).  Attached as <u>Exhibit C</u> is a true copy of relevant portions of the transcript of Anthony's deposition.

13.    Meyer testified at his deposition that:  a) he had discussions with the attorneys at Hale and Dorr that resulted in an understanding that a trust would be created for Alexis's benefit and that the money would be spent on her behalf (p. 22, line 20 – p. 23, line 4); b) he made the Check payable to David Burns as trustee because the money was earmarked for Alexis's trust to be used on her behalf (p. 47, line 18 – p. 48, line 7); and c) he would have told Fabiano that the funds had to be protected for Alexis and that her father was not entitled to any of them (p. 74,

line 17 – p. 76, line 2).  Attached as <u>Exhibit D</u> is a true copy of relevant portions of the transcript of Anthony's deposition.

**<u>OPG Has Acted Diligently</u>**

14.    It was not until these depositions were taken that OPG and its counsel obtained evidence that would support claims of conversion and breach of contract against the Defendants. With respect to the conversion claim, it was only from the depositions of Fabiano, Fay and Anthony that OPG was able to obtain information about how the Check was handled by the Defendants.  Furthermore, with respect to the breach of contract claim, OPG discovered through those same depositions that the representatives of the Defendants who had spoken with Meyer remembered very little about the substance of their conversations.  It was only when Meyer testified at his deposition, on August 29, that OPG learned the substance of Meyer's conversations with Fabiano, Fay and Anthony, and it is the substance of those conversations that provides the factual basis for OPG's breach of contract claims.

15.    After OPG obtained the deposition testimony described above, it was still necessary to conduct legal research in order to determine whether, in the light of those newly discovered facts, there was a legal basis for asserting a claim of conversion in violation of the Uniform Commercial Code, as codified at Mass. Gen. Laws, c. 106.  After performing the legal research necessary to make that determination, OPG and its counsel promptly drafted and filed the proposed Second Amended Complaint, together with the Motion for Leave to Amend.

16.    In their opposition to the pending motion, the Defendants assert (in footnote 3, on page 5) that OPG's chapter 93A demand letter "clearly indicates knowledge of the underlying facts now claimed as supporting the alleged claims for breach of contract and conversion."  That statement is wrong.  As an example, OPG's demand letter (which is Exhibit A to the Amended

Complaint [Docket No. 8]) asserted that Alexis's father picked up the Check from Meyer and delivered it to the Defendants.  However, the recently obtained deposition testimony described above demonstrates that OPG's initial assumption about that important fact – the manner in which the Check was delivered to the Defendants – was incorrect.  According to Meyer's recent deposition testimony, Meyer had the Check delivered directly to Hale and Dorr by messenger.  That difference is significant, because Meyer's testimony demonstrates that the Defendants were acting as agents of Alexis pursuant to their agreement with Meyer, rather than at the direction of Mr. Burns, and that Meyer was not allowing Mr. Burns to exercise control over the Check.  Meyer's testimony on that point – which OPG learned only recently – is an important element that supports OPG's proposed new claims.

**No Prejudice To The Defendants**

17.     Allowance of the Motion to Amend will not cause any undue prejudice to the Defendants.  Nor have the Defendants claimed that they would be prejudiced in any way.

**The Defendants' Lack of Diligence Has Delayed Resolution Of This Case**

18.     To the extent that any discovery delays have occurred, they are the result of the Defendants' failure to fulfill their discovery obligations in a timely manner.  Under the Court's initial scheduling order [Docket No. 10], fact discovery was to be completed by September 15, 2006.  As a result of scheduling issues, not all of the depositions could be concluded by that date.  Therefore, the parties filed a joint motion to amend the scheduling order [Docket No. 16] so as to extend the deadline for fact discovery by two weeks to September 29, 2006, and to extend subsequent deadlines accordingly.  The Court allowed that motion.

19.     OPG then completed its remaining depositions of fact witnesses in accordance with the revised schedule.

20.     However, the Defendants did not.  Only one of the five depositions of fact witnesses taken by the Defendants was concluded before the September 29 deadline.  They concluded their last deposition almost a month later, on October 25, 2006.

21.     Furthermore, on October 25, 2006 (the day of the last deposition taken by the Defendants), counsel for the Defendants produced additional documents to OPG's counsel.  Those documents include a document (Bates No. HD1509-HD1510) that refers to Alexis as a client of the Defendants.  That document (attached as Exhibit E) flatly contradicts the Defendants' position in this case – that their only client was Alexis's father, David Burns, and that they never represented Alexis herself.

22.     Following receipt of those documents, I informed counsel for the Defendants, Jerome P. Facher, Esquire, that it would be necessary to re-open discovery in order to obtain deposition testimony about the newly produced documents.  Mr. Facher agreed to the filing of a joint motion to modify the scheduling order in order to permit that discovery.  I anticipate that that motion will be filed shortly.

23.     The completion of fact discovery is also being delayed as a result of the Defendants' claim that certain documents are protected from discovery by the attorney-client privilege.  OPG's motion to compel discovery of those documents ([Docket No. 17] is pending.  If the Court allows that motion, it will undoubtedly be necessary to obtain deposition testimony relating to those documents.

**No Impact on Case Management**

24.     Although the Defendants' untimely production of highly relevant documents requires a further extension of the deadlines established by the Court in its scheduling order, the allowance of OPG's pending Motion to Amend will have no effect whatsoever on the existing

deadlines, or on any revised deadlines, or on any other aspect of the Court's management of this case. Specifically:

- no additional discovery will be required as a result of amending the complaint;

- the deadlines for other events set forth in the Amended Scheduling Order will not be affected as a result of amending the complaint;

- amendment of the complaint will not affect the deadlines for expert discovery or the filing of dispositive motions;

- amendment of the complaint will not delay the trial of this case.

Sworn under the penalties of perjury this 20th day of November, 2006.

_/s/ R. Alan Fryer_____
R. Alan Fryer

100492

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED THIS DAY UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY ELECTRONIC SERVICE THROUGH ECF, AND BY FIRST-CLASS MAIL.

_11/20/06_        _____/s/ R. Alan Fryer_____
Date                                    Signature

# **Exhibit A**

Exhibits:  1 - 14          Volume 1, Pages 1 - 86

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

       Plaintiff

vs.          Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

       Defendants

-----------------------------

DEPOSITION OF JOHN FABIANO

Tuesday, August 1, 2006, 10:05 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts

------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com  www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

John Fabiano
Volume 1 - August 1, 2006

1    Q.  Do you recall who delivered the letter to
2  you?
3    A.  No.  I'm sure it was a messenger.  It
4  wasn't Drew or Kelly.
5    Q.  Do you remember meeting with Mr. Burns
6  about the time that the check arrived?
7    A.  I have a memory that I went down to a
8  conference room and there were people in the
9  conference room.  Michael Fay.  I don't remember
10  whether Jeff Anthony was there, and Mr. Burns, and
11  they handed the check over.
12    Q.  But you remember the check actually being
13  delivered to you?
14    A.  Yes.
15        (Dorothy Bickford has entered the room.)
16        MR. FRYER:  This is Dorothy Bickford.
17    Q.  In the letter marked Exhibit 4 it refers to
18  the check being enclosed, correct?
19    A.  Yes.
20    Q.  And it goes on to say that it represents
21  the proceeds due to the Alexis Burns Trust.  Do you
22  see that?
23    A.  I see those words.
24    Q.  Do you have an understanding of what was

1  being referred to by the words Alexis Burns Trust?
2    A.  No.  I don't have any memory of discussing
3  the payee.  I remember calling and saying I need the
4  check, where is the check, and it was delivered to
5  me.
6    Q.  Do you have a memory of ever having any
7  discussion with Mr. Meyer about the funds that he
8  recovered for Alexis Burns being placed into a
9  trust?
10    A.  I do not.
11    Q.  Did you look at the check when the letter
12  arrived?
13    A.  I'm certain I did, if for nothing else to
14  make sure the amount was right.
15    Q.  If you look at Exhibit 5, do you see that
16  the payee on the check is David Burns, trustee?
17    A.  I see that's what it says.
18    Q.  And it says in the reference in the lower
19  left that it is for Burns, A?
20    A.  Yes.
21    Q.  Did you understand the Burns, A to be a
22  reference to Alexis Burns?
23    A.  I don't remember thinking about it then.  I
24  would interpret that now as being for Alexis Burns.

1    Q.  Do you remember having any thoughts about
2  the payee indicating that it was payable to David
3  Burns as trustee?
4    A.  No, I do not.  As far as I was concerned,
5  this was money that was going to be invested by
6  David Burns with Haldor.  I didn't think any further
7  about it than that.
8    Q.  Now, you indicated a moment ago that you
9  had reviewed some of your firm's invoices in
10  connection with this matter; is that correct?
11    A.  I simply looked at my own time entries on
12  the bill.
13    Q.  Let me show you a letter dated December 29,
14  1999 with Bates number HD 0852 with an invoice
15  attached.  Is that the invoice that you were
16  referring to?
17    A.  Yes.  The invoice is what I looked at.  I
18  don't remember if it was attached to the letter.  I
19  didn't look at the letter.  I just looked at the
20  entries on the detail sheet of the bill.
21    Q.  Now, the invoice consists of a summary page
22  at the beginning; is that right?
23    A.  Yes.
24    Q.  That's the first page after the letter?

1    A.  Mm-hmm.
2    Q.  And following that are the detail entries?
3    A.  Yes.
4    Q.  Now, if you look at the first page of
5  detail entries which has Bates number HD 0854, the
6  first entry reflecting time billed by you is May
7  24th?
8    A.  That's correct.
9    Q.  And there's another entry on May 27?
10    A.  Yes.
11    Q.  And the May 24th entry corresponds to that
12  meeting that you referred to earlier?
13    A.  Yes.  I think that's the sales pitch
14  meeting, bring the money to Haldor.
15    Q.  And that meeting is described in the
16  invoice as conference with Mr. Burns, Mr. Fay and
17  Mr. Anthony?
18    A.  Yes.  And the telephone from Mr. Burns, I
19  have some vague memory that he got lost on the way
20  down from New Hampshire and called me for
21  directions.  I don't think it is anything beyond
22  that.
23    Q.  So your time entry for that day totals an
24  hour and a half, correct?

John Fabiano
Volume 1 - August 1, 2006

Page 74

1  anything else about it.
2      Q.  Were you present when this check was
3  endorsed?
4      A.  No.
5      Q.  What's the source of your understanding
6  that Mr. Burns was acting as PPA for his daughter in
7  the lawsuit, the med/mal case?
8      A.  I think I have two courses.  One, I think
9  that Mr. Meyer told me that in the first telephone
10 conversation.  And somewhere, and it may have been
11 just yesterday, I saw a copy of the judgment.  The
12 judgment listed the PPAs.
13     Q.  When you refer to the judgment, are you
14 referring to the actual judgment entered in the
15 medical malpractice case?
16     A.  I think I'm referring to the rescript from
17 the SJC.  I saw a court document with a caption on
18 it.  I don't remember which document it was.
19     Q.  Are you referring to something that was
20 published in the published decisions of the SJC?
21     A.  No.  It was a docket entry from -- I don't
22 know if it was the SJC or the superior court.  It
23 was a Xerox of a document.
24     Q.  Was it a one-page document?

Page 75

1      A.  Yes.
2      Q.  Did it say judgment on it?
3      A.  I thought it said judgment.  I remember
4  checking the amount of it.  It said -- it had the
5  caption, which was PPA, Alexis Burns PPA.  I thought
6  it said PPA David Burns.
7          MR. FRYER:  Give me a minute.  I think I
8  can find that quickly if we can find it.
9          (Pause.)
10     Q.  Let me show you this document.  Is this the
11 judgment that you were just referring to?
12     A.  No, it is not.  I mean, it looks -- it is
13 of the same format, but it is not the one I
14 remember.
15     Q.  Let me show you another document and ask
16 you if this is the one you were referring to.
17     A.  No.
18     Q.  Did it look similar?
19     A.  It was this sort of document.  Neither of
20 these has exactly the format that I have in my
21 mind's eye.
22         MR. FACHER:  We had better mark these
23 before we forget what they were.
24         MR. FRYER:  I'm going to mark them.

Page 76

1          MR. FACHER:  The record wouldn't know
2  what we are talking about.
3          (Marked, Exhibit 11, judgment for
4  plaintiffs after rescript.)
5      Q.  The first document that I showed you has
6  been marked as Exhibit 11.  The title of it is
7  Judgment for Plaintiffs After Rescript.  Do you see
8  that?
9      A.  Yes, I do.
10         (Marked, Exhibit 12, judgment on jury
11 verdict for plaintiff.)
12     Q.  The second document that I showed you,
13 which has been marked Exhibit 12, is titled Judgment
14 on Jury Verdict for Plaintiff, correct?
15     A.  Yes.
16     Q.  Can you give me any more precise
17 description of what the document is you saw
18 yesterday?
19     A.  It might have been the denial of further
20 appellate review by the SJC.
21     Q.  How did you come to see that document?
22     A.  Mr. Facher showed it to me in the pile of
23 stuff.
24     Q.  Do you remember exactly what it indicated

Page 77

1  in terms of capacities of the parties?
2      A.  I do remember that it said PPA.
3      Q.  Did it designate who was the PPA?
4      A.  I don't remember.
5          MR. FRYER:  Jerry, if I could ask that a
6  copy of that be made available.  It may have been
7  produced, but just so we can know what it is that
8  Mr. Fabiano is testifying about.  If you could do
9  that I would appreciate it.
10         MR. FACHER:  Okay.  Do you have the
11 Court of Appeals?
12         MR. FRYER:  I may, if you want me to
13 take another minute to find it.
14     A.  This is the Court of Appeals rescript,
15 Exhibit 11.
16         MR. FACHER:  That's a Superior Court
17 document.
18     Q.  Let me show you this document.  I haven't
19 made copies yet.  But is this, by any chance, the
20 document that you saw yesterday?
21     A.  No, it is not.
22         MR. FACHER:  I'll find it if you would
23 like.
24     Q.  This is a document entitled Stipulation of

20 (Pages 74 to 77)

**<u>Exhibit B</u>**

Exhibits: 52-61         Volume 1, Pages 1-207

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

      Plaintiff

vs.            Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

      Defendants

------------------------------

DEPOSITION OF MICHAEL L. FAY

Thursday, August 10, 2006, 10:10 a.m.

Wilmer Cutler Pickering Hale and Dorr LLP

60 State Street

Boston, Massachusetts

------- Reporter:  Susan J. Blatt, RPR -------

sblatt@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

Michael L. Fay
Volume 1 - August 10, 2006

Page 10

1  from that, yes, I do understand.
2      Q.  Now, do you know Andrew Meyer?
3      A.  Yes.
4      Q.  When did you first become acquainted with
5  Mr. Meyer?
6      A.  Mr. Meyer was introduced to me by Mr.
7  Fabiano, one of our partners, at a time at which Mr.
8  Meyer had referred to Mr. Fabiano a client of his
9  who had received a significant judgment, a medical
10  malpractice judgment arising from the death of a
11  gentleman's wife, and who was seeking advice
12  regarding investment and possibly regarding estate
13  planning.
14      Q.  Do you recall approximately when it was
15  that Mr. Fabiano introduced you to Mr. Meyer?
16      A.  It was likely 1998 or 1999, but I'd have to
17  go back and consult records to be positive.
18      Q.  And in connection with the matter that you
19  mentioned, did Mr. Meyer refer his client to your
20  firm for any legal services?
21      A.  He referred clients from time to time who
22  had received large judgments, so far as I can recall
23  all arising from medical malpractice cases, who
24  might require investment advice or estate planning

Page 11

1  advice in many, but -- I think in most cases, in the
2  majority of cases, might also benefit from advice
3  regarding establishment of a so-called special needs
4  trust.
5      Q.  When you first met Mr. Meyer, did he refer
6  any business to your firm?
7      A.  I don't understand.
8      Q.  Well, you mentioned that Mr. Meyer had
9  recovered a judgment in a death case.
10      A.  Yes.
11      Q.  And did he refer the people who he was
12  representing in that case --
13      A.  He did refer that gentleman, yes.
14      Q.  Let me finish the question before you
15  answer, please.
16      A.  Sorry.  I thought you were finished.
17      Q.  Did Mr. Meyer refer to your firm the people
18  on behalf of whom he had recovered that judgment?
19      A.  Yes.
20      Q.  And what was the name of the client?
21      A.  I can't recall at the moment.  If I had all
22  of my records, I could refresh my memory.
23      Q.  To your knowledge, was that the first
24  matter that Mr. Meyer had referred to your firm?

Page 12

1      A.  To my knowledge, yes.
2      Q.  Now, when you first met with Mr. Meyer to
3  discuss that matter, tell me what you remember about
4  your discussion with Mr. Meyer.
5      A.  The discussion took place by telephone, and
6  Mr. Meyer had spoken with, previously spoken with
7  Mr. Fabiano.  I don't remember any specifics of the
8  conversation.
9      Q.  Did you describe for Mr. Meyer the kind of
10  services that your firm could provide to his
11  clients?
12      A.  Yes.
13      Q.  Do you have any memory or understanding of
14  what you told Mr. Meyer about the services that your
15  firm could provide?
16      A.  I do not recall any specifics.
17      Q.  After Mr. Meyer referred that first matter
18  to your firm, what was the next matter that he
19  referred to your firm?
20      A.  It might have been the Burns matter, but I
21  don't recall for sure which one -- what the sequence
22  was of the cases that he referred to us.
23      Q.  Do you remember when it was that he
24  referred the Burns matter to your firm?

Page 13

1      A.  May 1999.
2      Q.  At the time that Mr. Meyer was referring
3  the Burns matter to your firm, did you have any
4  discussions about the matter with Mr. Meyer?
5      A.  I don't remember whether Mr. Meyer spoke to
6  me or whether he spoke to Mr. Fabiano.  I think he
7  spoke to Mr. Fabiano, but I'm not positive without
8  checking all of our records.
9      Q.  Now, you mentioned special needs trusts a
10  minute ago, correct?
11      A.  Yes.
12      Q.  Did the first matter that Mr. Meyer
13  referred to your firm involve the establishment or
14  the handling of a special needs trust?
15      A.  No.
16      Q.  What is the first matter that was referred
17  to your firm that involved a special needs trust?
18      A.  I don't recall which client it was.
19      Q.  Was the Burns matter one of the first
20  matters referred to your firm that involved a
21  special needs trust?
22      A.  Yes.
23      Q.  Did you have any discussion with Mr. Meyer
24  about special needs trusts back in 1998 or 1999?

4 (Pages 10 to 13)

Michael L. Fay
Volume 1 - August 10, 2006

Page 62

1    A.  I understood you to mean what steps would
2  be needed to move money from the agency account to a
3  trust account.  Perhaps I misunderstood.
4    Q.  I'm asking the more general question.  You
5  understood -- let me see if I can recap where we are
6  here.
7    A.  Sure.
8    Q.  You understood from Mr. Burns that he
9  wanted to establish a special needs trust for the
10  benefit of Alexis, correct?
11    A.  Correct.
12    Q.  And on or about May 27th, 1999, the funds
13  that had been recovered on behalf of Alexis, the net
14  proceeds were delivered to either Hale and Dorr or
15  Haldor, correct?
16    A.  Yes.
17    Q.  And at that point what needed to be done in
18  order to implement Mr. Burns' desire to establish a
19  special needs trust?
20    A.  A trust instrument would have to be drafted
21  with all pertinent provisions decided upon and
22  included and the document executed by the declarants
23  and the trustees.
24    Q.  And once the trust had been executed --

Page 63

1  well, let me ask it this way.
2    As of May 27th, 1999, when the net
3  proceeds were delivered to Hale and Dorr or Haldor,
4  the trust contemplated by Mr. Burns had not yet been
5  executed.  Is that right?
6    A.  Yes.
7    Q.  At that point, without a trust having been
8  executed, what needed to be done with the funds
9  received from Lubin & Meyer?
10    MR. FACHER:  Object to the form.  You
11  may answer.  What do you mean by "what had to be
12  done with the funds"?
13    Q.  What would your firm or Haldor do with the
14  net proceeds received from Lubin & Meyer from the
15  time that you received them until the time that any
16  special needs trust was executed?
17    MR. FACHER:  Object to the form.
18    A.  One option was for Mr. Burns to create an
19  agency arrangement with Haldor and to place the
20  funds on deposit in connection with creation of that
21  agency account.
22    Q.  Were there other options?
23    A.  He could have held the check.
24    MR. FACHER:  Could have what?

Page 64

1    A.  I said he could have held the check and
2  done nothing with it or deposited it elsewhere.
3    Q.  At some point -- let me ask it this way.
4  Before you saw a copy of the check as represented in
5  Exhibit 5 from Mr. Fabiano's deposition, did you
6  have any understanding as to who the original check
7  was payable to?
8    A.  No.
9    Q.  And to the best of your memory, you never
10  saw the original check when it was delivered to Mr.
11  Fabiano?
12    A.  I don't know.  My testimony was and is that
13  I don't recall one way or the other.
14    Q.  What's your -- let me ask it this way.  Is
15  there any legal significance to a check being
16  payable to someone as trustee rather than to that
17  person in their individual capacity?
18    MR. FACHER:  Object to the form.  You
19  can answer.
20    A.  It may -- no.  It's not sufficient to
21  create a trust, in any event.
22    Q.  To your knowledge, as of May 27, 1999, was
23  David Burns a trustee of any trust?
24    A.  No.

Page 65

1    Q.  Was it your understanding that Mr. Burns --
2  let me ask it this way.
3    If Mr. Burns was not a trustee of any
4  trust as of May 27th, 1999, was it proper for him to
5  endorse a check made payable to him as trustee?
6    MR. FACHER:  Object to the form.
7    A.  Yes.
8    Q.  What's your basis for saying that?
9    A.  The funds in fact were under his control.
10  He was the father.  He had custody of the child.
11  The litigation had been prosecuted by Mr. Burns and
12  Alexis's mother per prochein ami, as next friend,
13  and he held the funds in a representative capacity
14  on behalf of Alexis.
15    Q.  Do you know who was named as next friend of
16  Alexis in the medical malpractice case?
17    A.  I understood it to be her parents.
18    Q.  And what's the basis for your
19  understanding?
20    A.  I recall seeing a document to that effect.
21    Q.  Can you tell me which document you saw that
22  indicated that?
23    A.  Not offhand, no, I can't.
24    Q.  Is that a document that you saw in

**Exhibit C**

Exhibits: 15-36        Volume 1, Pages 1-166

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

       Plaintiff

vs.       Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

       Defendants

------------------------------

DEPOSITION OF JEFFREY E. ANTHONY

Thursday, August 3, 2006, 10:15 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts

------- Reporter: Susan J. Blatt, RPR -------

sblatt@fabreporters.com  www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

Page 42

1  of establishing a trust.  Is that right?
2      A.  Yes.
3      Q.  Where did that understanding come from?
4      A.  From listening to a conversation between
5  Mr. Burns and Michael Fay.
6      Q.  Describe what you remember of the
7  conversation between Mr. Burns and Mr. Fay that
8  related to the possibility of establishing a trust.
9      A.  I don't remember a lot about it.  I mean,
10  my focus was on the investment side.  I just
11  honestly don't remember a lot about it.
12      Q.  Well, you described earlier that there were
13  differences between trust accounts and agency
14  accounts that Haldor handled, correct?
15      A.  Yes.
16      Q.  Was it important in understanding Mr.
17  Burns' needs to understand whether a trust was going
18  to be established for the account?
19          MR. FACHER:  Object to the form.
20      A.  I don't know if it was important or not.
21  We --
22          MR. FACHER:  Just answer the question.
23  He'll ask you another question.
24      Q.  Wouldn't it make a difference to you

Page 43

1  whether there was going to be a trust or not?
2          MR. FACHER:  Object to the form.
3      A.  I don't know that it would make a
4  difference.  I mean, I don't know that it would.
5      Q.  You said earlier if there was a trust
6  account it might be important to know what the terms
7  of the trust were, correct?
8      A.  Yes.
9      Q.  And that could require that the investments
10  be handled in a manner different from the way you
11  would otherwise handle them in an agency account,
12  correct?
13      A.  We had discussed --
14          MR. FACHER:  Wait a minute.  Object to
15  the form.
16      A.  I guess you don't know whether there would
17  be a difference.  You don't know -- what I
18  discussed --
19          MR. FACHER:  Just answer the question.
20  He'll ask you another one.
21          THE WITNESS:  Okay.
22      Q.  What do you remember Mr. Fay saying about
23  the possibility of establishing a trust for the
24  Burns matter?

Page 44

1      A.  As I said, I don't remember a lot about
2  being part of that discussion at all.
3      Q.  What do you remember being said?
4      A.  That -- I'd just be speculating.
5      Q.  I don't want you to speculate, but if you
6  have a memory of what was said --
7      A.  I don't.
8      Q.  -- I'd like you to say what it was.
9      A.  Yeah, I don't.
10      Q.  When you first met with Mr. Burns, did you
11  take any notes?
12      A.  Not that I recall.
13      Q.  At the first meeting you had with Mr.
14  Burns, did you discuss with him the kinds of issues
15  that we talked about earlier, his investment goals,
16  diversification, asset allocation and so forth, did
17  you have any of that kind of discussion with him at
18  that first meeting?
19      A.  I don't recollect so.  I recollect more
20  that I was telling him what our investment services
21  were.
22      Q.  Now, tell me what you remember about your
23  second meeting with Mr. Burns.
24      A.  I believe I presented an agency agreement

Page 45

1  to him so that an account -- an investment account
2  could be opened.
3      Q.  Is that an agreement that you had prepared
4  in advance?
5      A.  Yes.
6      Q.  What prompted you to prepare that document
7  in advance of the second meeting?
8      A.  We had -- somehow I had gotten an
9  indication that he wanted to open an investment
10  account with us.
11      Q.  Do you remember how that was indicated to
12  you?
13      A.  It -- I don't.  I don't.
14      Q.  Do you know who indicated that to you?
15  Would it have been Mr. Burns or Mr. Fay or someone
16  else?
17      A.  I don't.
18      Q.  Do you remember who was at the second
19  meeting you had with Mr. Burns?
20      A.  I believe Mr. Fay.
21      Q.  Do you remember anyone else being there?
22      A.  I'm not sure if Mr. Fabiano stopped by or
23  not.
24      Q.  He may have, but you don't remember

Jeffrey E. Anthony - August 3, 2006

Page 50

1  Q.  Let me show you Fabiano Exhibit 5.  Do you
2  recognize that as the check that represented the
3  funds to be invested on behalf of Burns through
4  Haldor?
5  A.  Yes.
6  Q.  And when did you first see that check?
7  A.  At the meeting on the 27th.
8  Q.  That's the second meeting with Mr. Burns?
9  A.  Yes.
10  Q.  Let me show you Fabiano Exhibit 4, which is
11  a letter that according to Mr. Fabiano's testimony
12  accompanied the check.  Have you seen that letter
13  before?
14  A.  Yes.
15  Q.  Did you see it at the time the check
16  arrived?
17  A.  I do not recall seeing it then.
18  Q.  So you don't have any memory whether you
19  saw the letter or read the letter at the time of
20  your second meeting with Mr. Burns?
21  A.  No.
22  Q.  Do you see the date of the letter and the
23  check are both May 27, 1999?
24  A.  Yes.

Page 51

1  Q.  And is it your memory that that's when the
2  second meeting with Mr. Burns took place?
3  A.  Yes.
4  Q.  Now, when the check arrived, who was it
5  delivered to?  Let me ask it this way, how did the
6  check appear at the meeting you were having with Mr.
7  Burns?
8  A.  I don't recall.
9  Q.  You don't remember whether Mr. Burns had it
10  with him or whether someone delivered it to the
11  meeting?
12  A.  I don't.
13  Q.  Once you saw the check, what happened to
14  it?
15  A.  I believe it was given to me after
16  documents -- a document was signed to open an agency
17  account.
18  Q.  When the check was given to you, it had
19  already been endorsed?
20  A.  Yes.
21  Q.  Do you remember looking to see whether it
22  had been endorsed?
23  A.  Yes.
24  Q.  Do you remember how it was endorsed?

Page 52

1  A.  No.
2  Q.  Did you make a copy of the check for your
3  file?
4  A.  I can't remember.
5  Q.  Would it have been your usual practice to
6  make a copy of a check like this?
7  A.  Yes.
8  Q.  And would it have been your usual practice
9  to copy the back side of the check so you had a
10  record of the endorsement?
11       MR. FACHER:  Object to the form.
12  A.  I don't know.  I don't remember.
13  Q.  Would that be your practice today?
14  A.  Yes.
15  Q.  Do you remember at any point between May of
16  1999 and today any event that would have prompted
17  you to make it your practice to copy the back side
18  of a check like this if that had not been your
19  practice before?
20       MR. FACHER:  Object to the form.
21  Q.  Let me ask it this way.  Do you have a
22  memory of adopting at any time the practice of
23  copying the back side of a check such as this one
24  when it was delivered to you?

Page 53

1  A.  No.  Normally that would have been done by
2  my assistant.
3  Q.  Well, is it your practice to instruct your
4  assistant to make a copy of the endorsement on the
5  back side of a check being delivered to your firm
6  for investment?
7       MR. FACHER:  You're talking what time?
8  Are you talking now?
9       MR. FRYER:  Yes.
10       MR. FACHER:  Is it now his practice?
11  A.  Yes.
12  Q.  Do you remember any time when it was not a
13  part of your practice to have your assistant copy
14  the endorsement on the back side of a check that was
15  being delivered to your firm for investment?
16       MR. FACHER:  Object to the form.
17  A.  Could you say that again, please.
18  Q.  Do you remember there ever being a time
19  when it was not your practice to have your assistant
20  copy the endorsement on the back side of a check
21  such as this when it was being delivered to your
22  firm for investment?
23       MR. FACHER:  Object to the form.
24  A.  I don't recall.

Page 54

1    Q.  When the check was given to you, do you
2  remember who handed it to you?
3    A.  No.
4    Q.  When you got the check, did you inspect it?
5    A.  I looked at it.
6    Q.  Did you look at who it was payable to?
7    A.  Yes.
8    Q.  Did you look at the amount?
9    A.  Yes.
10    Q.  Did you look to see if the payee on the
11  check matched the endorsement on the back of the
12  check?
13    A.  I don't recall.
14    Q.  Would that have been your usual practice?
15    A.  My usual practice would have been to give
16  this to our operations people to inspect.
17    Q.  And would you do that without first
18  checking yourself to see whether it was properly
19  endorsed?
20        MR. FACHER:  Object to the form.  You
21  can answer.
22    A.  I would have looked at both sides of the
23  check.
24    Q.  Now, when you looked at the check and saw

Page 55

1  who the payee was -- you see that it says "David
2  Burns," comma, "trustee," correct?
3    A.  Yes.
4    Q.  When you looked at that, did you have an
5  understanding of what the word "trustee" referred
6  to?
7    A.  No.
8    Q.  Did you ask anyone what that referred to
9  while you were at that meeting?
10    A.  No.
11    Q.  At the time that this check was delivered
12  to you, were you aware of any trust that Mr. Burns
13  was a trustee of?
14    A.  I had no knowledge whether he was or was
15  not.
16    Q.  At the time of your May 27th meeting with
17  Mr. Burns, what did you know about his daughter
18  Alexis?
19    A.  That she did have a medical condition.
20    Q.  Did you know anything more than that?
21    A.  That she was a minor.  That she had a
22  medical condition and that there had been a medical
23  malpractice lawsuit resulting in these funds.
24    Q.  What was your understanding as to the

Page 56

1  person on whose behalf these funds had been
2  recovered?
3    A.  My understanding was that her -- she was a
4  minor and that her father was her guardian or
5  custodian or parent, and that was my understanding.
6    Q.  How did you learn that?
7    A.  Through conversations with David Burns.
8    Q.  Mr. Fay had not explained any of that to
9  you when he first asked you to meet with Mr. Burns?
10        MR. FACHER:  Object to the form.
11    A.  I don't recall whether he did or not.
12    Q.  So Mr. Fay may have said something to you
13  about the background that generated these funds; you
14  don't remember.  Is that right?
15    A.  That's correct.
16    Q.  Do you remember at the time of the May 27th
17  meeting with Mr. Burns any reference being made to
18  the Alexis Burns trust?
19    A.  No.
20    Q.  What was your impression of Mr. Burns when
21  you met with him those two times?
22    A.  He was, appeared to be a quite normal,
23  concerned parent.  I mean, he wasn't disheveled-
24  looking, he wasn't drunk, he didn't have any strange

Page 57

1  appearance.  He appeared to be a quite normal,
2  concerned parent.
3    Q.  What discussion did you have with him about
4  investment goals?
5    A.  We discussed that, given the young age of
6  his daughter and that she was expected to have a
7  longer life span, that the funds should be invested
8  for growth for the future.
9    Q.  What, if any, discussion did you have with
10  Mr. Burns about asset allocation?
11    A.  That there would be, because of her young
12  age, there would be a heavier -- a much heavier
13  concentration on stocks than there should be on
14  bonds.
15    Q.  Do you remember anything more specific than
16  that?
17    A.  No.  Other than we were going to put the
18  money to work over a period of time, not all at
19  once.  He did relate that there were medical bills
20  that he needed funds to recover, to pay.
21    Q.  What else did he say about medical bills
22  that needed to be paid?
23    A.  I believe he said that he had an immediate
24  need for some money to cover outstanding bills.

15 (Pages 54 to 57)

Jeffrey E. Anthony - August 3, 2006

Page 58

1    Q. Medical bills or other bills?

2    A. He led me to believe they were medical

3 bills.

4    Q. Did he say anything about the nature of the

5 medical bills or the amount of the medical bills?

6    A. He did make a request at the opening of the

7 account for, I believe it was $3,000 to cover some

8 outstanding medical bills.

9    Q. And did he say that that amount would be

10 sufficient to cover the medical bills that were

11 outstanding?

12    A. He did that day, yes.

13    Q. And did he say whether there would be any

14 additional medical bills?

15    A. Yes. He said there would be future medical

16 bills.

17    Q. And did he explain what services he

18 expected would be required that would generate those

19 medical bills?

20    A. He didn't go into detail. He did say that

21 she was having special treatments and -- he didn't

22 explain them in detail.

23    Q. And you didn't ask for more detail?

24    A. No.

Page 59

1    Q. Did you have Mr. Burns describe for you any

2 previous investment experience that he had?

3    A. No.

4    Q. So you didn't ask him about prior

5 investment experience?

6    A. No.

7    Q. Did you ask him about his other assets or

8 sources of income?

9    A. No.

10    Q. At the time of the May 27th meeting with

11 Mr. Burns, was it your understanding that the funds

12 represented by the check that's Fabiano Exhibit 5

13 had been recovered on behalf of Alexis Burns?

14    A. Yes.

15    Q. And did you note that at the bottom left

16 corner of the check where there's a line that says

17 "for" it's filled in "Burns, A."?

18    A. Yes.

19    Q. Did you understand that to refer to Alexis

20 Burns?

21    A. I did.

22    Q. At the time of that May 27th meeting, were

23 you -- did you know whether Hale and Dorr was

24 providing any legal services to Mr. Burns for his

Page 60

1 daughter Alexis?

2    A. I didn't know if they were currently

3 providing legal services.

4    Q. As of the -- let me ask it this way. By

5 the end of the meeting with Mr. Burns on May 27th,

6 had Mr. Burns indicated to you that he had decided

7 to retain the services of Haldor?

8    A. Yes.

9    Q. Did he give any indication that he had

10 decided to retain the services of Hale and Dorr for

11 any legal matters?

12    A. I don't remember.

13    Q. Before you began being involved in the

14 Burns matter, had you had any other client where a

15 parent was investing sums that were for the benefit

16 of a minor child?

17    A. Yes.

18    Q. And in any of those situations, were the

19 sums moneys that had been recovered in a med mal

20 lawsuit or some other lawsuit for the benefit of the

21 child?

22    A. Yes.

23    Q. And in any of those matters were the funds

24 held in a trust account?

Page 61

1    MR. FACHER: At the time they arrived at

2 Hale and Dorr? Is that what you mean?

3    Q. Do you understand the question?

4    A. I had both types of situations where they

5 were held in a trust account or held in an agency

6 account.

7    Q. And when they were held in a trust account,

8 was there a trust instrument that defined the terms

9 of the trust?

10    MR. FACHER: Object to the form.

11    A. There may have been. It wasn't my area.

12    Q. Was there somebody at Hale and Dorr who was

13 familiar with the requirements of trusts and whose

14 particular responsibility it was to make sure that

15 those requirements in specific trusts were adhered

16 to?

17    MS. BICKFORD: Haldor.

18    Q. Did I say Hale and Dorr? I'm sorry. Was

19 there a particular employee at Haldor when you were

20 there who had the responsibility for ensuring the

21 terms of any trusts were adhered to?

22    A. Yes.

23    Q. Who was that person?

24    A. Barbara Marley.

16 (Pages 58 to 61)

**<u>Exhibit D</u>**

Exhibits: 98-104          Volume 1, Pages 1-87

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

ALEXIS J. BURNS by and through her

legal guardian, OFFICE OF PUBLIC

GUARDIAN

      Plaintiff

vs.          Civil Action No. 05-11113NMG

HALE AND DORR LLP, et al.

      Defendants

-----------------------------

DEPOSITION OF ANDREW C. MEYER, JR.

Tuesday, August 29, 2006, 10:07 a.m.

Badger, Dolan, Parker & Cohen

One State Street

Boston, Massachusetts

------- Reporter: Susan J. Blatt, RPR -------

sblatt@fabreporters.com  www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415, Boston, Mass. 02109

617.728.4404  fax 617.728.4403

Andrew C. Meyer, Jr.
Volume 1 - August 29, 2006

Page 22

1  Fabiano from Hale and Dorr, enclosing the check
2  we've been discussing.
3      Q. That's a letter from you?
4      A. It is.
5      Q. Signed by you?
6      A. It is.
7      Q. Let me ask you this. If you look at the
8  text of the letter itself, it says, "Enclosed find a
9  check," and it states the amount of the check and it
10  then says, quote, "representing the proceeds due to
11  the Alexis Burns trust." Do you see that?
12      A. I do.
13      Q. What's that a reference to?
14      A. The trust which we had anticipated would be
15  created for the purposes of holding the funds for
16  Alexis.
17      Q. When you say "we anticipated," who's the
18  "we"?
19      A. My firm.
20      Q. Why were you anticipating the creation of a
21  trust?
22      MR. HEYISON: Object to the form.
23      A. We had had discussions regarding what would
24  happen to the proceeds and how they should be held

Page 23

1  on behalf of Alexis which resulted in an
2  understanding that there would be a trust created
3  and that that money would be spent on behalf of
4  Alexis.
5      Q. When you say "we had discussions," who was
6  involved in those discussions?
7      A. I have no specific memory of having the
8  exact conversation, but I believe Michael Fay would
9  have been the one that I spoke with.
10      Q. Did you ever discuss with Alexis Burns or
11  either of her parents the issue of whether to create
12  a trust?
13      A. Absolutely.
14      Q. When did you discuss that?
15      A. Most likely post-verdict.
16      Q. Meaning after the entry of the final
17  judgment?
18      A. Or along the way -- no. It would have been
19  either during the course of the trial or somewhere
20  along the line. There was an offer during the
21  course of the trial which would give rise to a
22  conversation regarding what would become of these
23  funds, and then any time after that, I'm sure there
24  was ongoing discussion well before the final entry.

Page 24

1      Q. Who did you have those discussions with?
2      A. Bonnie Davis and David Burns.
3      Q. As a result of those discussions, was there
4  some decision reached as to what you would do with
5  the proceeds from the case?
6      MR. HEYISON: Object to the form.
7      A. There was.
8      Q. What was the decision?
9      A. To give the money to Hale and Dorr for the
10  purposes of creating a trust, maintaining the trust,
11  and investing the funds.
12      Q. Who made that decision?
13      A. I believe in the end it was David Burns.
14      Q. Was Bonnie Davis involved in making that
15  final decision?
16      MR. HEYISON: Object to the form.
17      A. I have no memory of that.
18      Q. Did you at some point refer anyone in the
19  Burns -- let me ask it this way.
20      Did you at some point refer Alexis Burns
21  or David Burns to Roland Gray?
22      A. I believe he may have interviewed both to
23  determine which he would use, both Hale and Dorr and
24  Roland Gray, as to what had to be done.

Page 25

1      Q. At the time that you were making this
2  recovery for Alexis Burns, did you know Roland Gray?
3      A. I did.
4      Q. Had you had any professional relationship
5  with him at that point?
6      A. I did.
7      Q. What was the nature of your relationship
8  with Mr. Gray?
9      A. He did special needs trusts for children we
10  represented who had some type of injury to
11  themselves as well as occasionally invested, oversaw
12  the investments of the moneys received in the trust.
13      Q. So before your recovery on behalf of
14  Alexis, you had other matters that you had referred
15  to Mr. Gray?
16      A. Yes.
17      Q. And some of those matters involved special
18  needs trusts?
19      A. Yes.
20      Q. What's your understanding of a special
21  needs trust?
22      A. It was a trust which would -- if needed in
23  the particular case, it was a trust which would hold
24  the funds and allow it to be available in a

Andrew C. Meyer, Jr.
Volume 1 - August 29, 2006

1  road, take care of whatever her needs were, and then
2  overseeing that had to be somebody who is
3  independently involved to ensure that the money
4  wasn't misspent.
5      Q.  Did either David Burns or Bonnie Davis as
6  the parents of Alexis have the final authority to
7  decide how the funds were handled?
8      A.  It's a more difficult question because that
9  calls for, to some extent for a legal conclusion.
10  It was our position that on behalf of and in
11  protection of Alexis we wanted and took steps to
12  protect the child in almost all cases to ensure that
13  the money was in a trust which would be spent on her
14  behalf.
15      Q.  What would prevent the parents from
16  handling the funds in a manner different than you
17  felt was appropriate?
18      MR. HEYISON:  Object to the form.
19      A.  I'm not sure I understand.  What would
20  prevent them in what way?
21      Q.  Because Alexis was a minor at the time the
22  funds were recovered for her benefit, someone had
23  to -- well, let me ask it this way.
24      Given that Alexis was a minor at the

1  time you recovered funds for her benefit, did she
2  have the authority to decide what happened with
3  those funds?
4      MR. HEYISON:  Object to the form.
5      A.  No.
6      Q.  Why not?
7      A.  She was a minor.  An incapacity, she was a
8  minor.
9      Q.  Who did have the authority at that point to
10  decide what would be done with the funds that you
11  recovered for her?
12      MR. HEYISON:  Object to the form.
13      A.  I don't believe that was ever determined
14  with finality.  However, we believed it was our
15  responsibility to try to direct the funds to a place
16  where she would be adequately protected, and -- I'll
17  leave it at that answer.
18      Q.  The check representing the net proceeds,
19  which is Exhibit 5, was there a reason for making it
20  payable to David Burns, trustee, rather than David
21  Burns individually?
22      A.  Absolutely.
23      MR. HEYISON:  Object to the form.
24      A.  Yes.

1      Q.  What was the reason?
2      A.  Because the money was earmarked for
3  Alexis's trust to be used on her behalf and in her
4  interest and was not -- as they were not any more
5  plaintiffs, they had not been awarded any sums of
6  money, entitled to the sums for their own use,
7  either Bonnie or Mister -- David.
8      Q.  Did one of the matters you referred to Hale
9  and Dorr involve Joseph Lamonica as administrator of
10  an estate?
11      A.  It could.
12      Q.  Let me show you Exhibit 9.  Is that a
13  letter from you to Mr. Fabiano relating to the
14  Lamonica matter that you handled?
15      A.  It is.  It is.  It's nice to come here and
16  be presented with our victories.
17      Q.  The date of the letter is what?
18      A.  February 11, '99.
19      Q.  That was before the Burns matter was
20  referred over to Hale and Dorr?
21      A.  Yes.
22      Q.  Did you also refer to Hale and Dorr a
23  matter relating to the Kyle Morin trust?
24      A.  I did.

1      Q.  Was that a special needs trust?
2      MR. HEYISON:  Object to the form.
3      A.  I don't think I ever saw the trust.  I
4  assume it was.
5      Q.  Was this a recovery for the benefit of a
6  minor?
7      A.  Yes.
8      Q.  Did you refer to Hale and Dorr --
9      A.  I also believe the parents might have been
10  plaintiffs in that case as well, though.
11      Q.  Did you also refer to Hale and Dorr a
12  matter involving Ellen Scopa as administratrix for
13  Deborah Wood?
14      A.  I think we did.
15      Q.  Did you refer to Hale and Dorr a matter
16  involving Nicholas Sumner?
17      A.  I don't remember.
18      Q.  What about a matter relating to Luzelena
19  Miranda?
20      A.  May have.
21      Q.  Did you refer a matter to Hale and Dorr
22  involving Felix Ayala?
23      A.  I think we did.
24      Q.  Did you refer to Hale and Dorr a matter

13 (Pages 46 to 49)

Andrew C. Meyer, Jr.
Volume 1 - August 29, 2006

Page 74

1    Q. Now, as of the date of Exhibit 8, this was
2  almost two months after you had issued the check
3  payable to David Burns, trustee, correct?
4    A. Correct.
5    Q. And as of that date, was it your
6  expectation that the settlement funds would have
7  been deposited in the Haldor account and invested
8  and earning interest or being invested for growth?
9    A. One would have -- I believed they were
10  being handled appropriately and prudently at that
11  time.
12    Q. In your view, handling them appropriately
13  and prudently would have been investing them so that
14  the money was working, correct?
15    MR. FRYER: Objection.
16    A. Correct.
17    Q. Mr. Meyer, at any time in 1999, did you
18  tell Mr. Fabiano or Mr. Fay or anybody else from
19  Hale and Dorr that they needed to watch out for
20  David Burns because you had an expectation that he
21  would dissipate the funds and not use them for
22  Alexis Burns's benefit?
23    MR. FRYER: Objection.
24    A. I had an overall conversation with Michael

Page 75

1  Fay when I first started referring these kinds of
2  cases regarding his obligation and his necessity to
3  act prudently and carefully on behalf of these
4  children and not to allow parents to take off with
5  the money, because of the one experience I had where
6  I allowed parents to take the money and not have a
7  trust and not have it protected or independent, they
8  took off and spent the money and not on the behalf
9  of the child; and there are other stories regarding
10  that. I did have a conversation with Michael Fay on
11  an overall basis that this is a problem and it has
12  to be protected against, which is why we need an
13  independent.
14    I'm also convinced that I had a
15  conversation with Jack Fabiano about David Burns,
16  that he was not necessarily the most responsible nor
17  trustworthy individual I'd ever met. I know I had
18  concerns about that. There is little doubt in my
19  mind that I would have communicated that to Jack and
20  had conversation about that concern about probably
21  the relationship between Bonnie and David; and
22  therefore, although I may not have expressly said
23  "Be careful, he'll dissipate the funds," it was
24  "These funds have to be protected for Alexis. He's

Page 76

1  not entitled to any of them." I would have said
2  that.
3    Q. But give a specific conversation -- a
4  specific memory of your conversation with Jack
5  Fabiano where you said to him you had the following
6  concerns about David Burns.
7    A. I'm sure I had a conversation with Jack
8  about the issues I just raised.
9    Q. But do you have a memory of it sitting here
10  today?
11    A. Vaguely.
12    Q. But do you have a specific memory?
13    A. You say "a specific memory." Can I tell
14  you the time and date? Any case I referred over to
15  Jack or to Michael, and if the contact was Jack, he
16  would want to take the check, I think, and be the
17  deliverer of the check. He was my contact over
18  there. I would call him up and describe the
19  circumstances. I would describe the people. I
20  would describe the type of case and what occurred
21  and that it was coming over. And we did that.
22    So I would have a conversation with Jack
23  about the personalities involved, who they were,
24  what the case was about, and part of that

Page 77

1  conversation by necessity would be my assessment of
2  the personalities involved. And my assessment of
3  Mr. Burns was that he was dangerous.
4    Q. And that was part of your general mode of
5  operating when you were referring cases?
6    A. Yes.
7    MR. HEYISON: Can we just take a quick
8  break?
9    MR. FRYER: Sure.
10    (Recess 12:01 to 12:11.)
11  BY MR. HEYISON:
12    Q. Just a few questions. Mr. Meyer, the
13  conversation or the discussion that you testified
14  about with Mr. Fabiano, you can't tell me whether it
15  was in person or over the telephone?
16    MR. FRYER: Objection.
17    A. I can probably tell you it was over the
18  telephone.
19    Q. And you can't tell me what date it
20  occurred?
21    A. I cannot.
22    Q. You can't tell me how long the conversation
23  was?
24    A. I cannot.

20 (Pages 74 to 77)

**<u>Exhibit E</u>**

**New Client** */0 9/47- 806*        Receiving Office: **BOS**

Client Name: **Alexis Burns**        *138165*        *244643*        *D*

Client Industry Code: **L3**

Is Client Publicly Traded?   **No**

Matter Name: **Agency**        *138166*        *244644*

Date to Open: **11-jun-1999**

Does client/matter in any way involve a government entity?   **No**

Matter Department: **PERS**

Statute of Limitation?   **No**

Type of Law Code: **4004   - Individuals - Individual Agency**

Work Summary: **Agency**


PARTIES WITH DIFFERING INTERESTS (0 previous)

**THERE ARE NO OPPOSING PARTIES FOR THIS MATTER**




PARTIES DIRECTLY RELATED TO CLIENT (0 previous)

**THERE ARE NO PARTIES RELATED TO THIS CLIENT**




RELATED PARTIES FOR THIS MATTER ONLY (0 previous)

**THERE ARE NO RELATED PARTIES FOR THIS MATTER**

CLIENT/MATTER INPUT FORM

Client Name: *Alexis Burns*

Matter Name: *Agency*

Billing Category: *CLI*          Fee Arrangement: *STD*

Are there any special billing requirements? *No*  Billing Frequency: *MONTHLY*

### Billing Address

Attention: *Mr. David Burns*
   Title:
Company:
Address: *2 Coopers Grove*

   City: *Kingston,*                State: *NH*  Zip Code: *03848*
Country:                           Telephone Number: *99977-020*
                                   FAX Number:

Change Client Level Address?  *No*
Change Matter Level Address?  *Yes*

Contact Attorney:      *13 - Fabiano*
Billing Attorney:    *1038 - Anthony*
Filing Attorney:     *1038 - Anthony*        File Size: *LETTER*
Partner In Charge:    *137 - Fay*
Receiving Attorney:    *13 - Fabiano*

   Proposed Responsibility Credit            Basic Client Credit
   ~~992  Firm Haldor      100.000~~

*Credit Sharing Agreement not Required*

*Do not establish Basic Client Credit*

Will an engagement letter be sent to the client?  *No*