UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXIS J. BURNS by and through her legal guardian, OFFICE OF PUBLIC GUARDIAN<br><br>Plaintiff,<br><br>v.<br><br>HALE AND DORR LLP, WILMER CUTLER PICKERING HALE AND DORR LLP, HALDOR INVESTMENT ADVISORS LIMITED PARTNERSHIP, and HALE AND DORR CAPITAL MANAGEMENT LLC<br><br>Defendants. | C.A. NO. 05 11113NMG |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION TO FURTHER AMEND SCHEDULING ORDER

The plaintiff not only has improperly moved to file a Second Amended Complaint after the time provided in the Court's Scheduling Order, but now has filed a Motion to extend the amendments deadline which expired ten months ago. This latest Motion, however, still does not provide good cause for the plaintiff's failure to comply with the Court's deadlines because (1) the plaintiff has long been aware of the facts allegedly supporting the proposed claims of breach of contract and conversion, and (2) the record that the plaintiff relies upon to show good cause fails to provide any statements supporting the plaintiff's allegations.

### Procedural History

The plaintiff filed this action on May 27, 2005, with a lengthy Complaint containing over seventy detailed allegations and pleading seventeen causes of action. [Docket No. 1]. On

USIDOCS 5968964v1

September 13, 2005, the plaintiff filed an Amended Complaint to cure the failure to comply with the demand letter requirement of G.L. c. 93A. [Docket No. 8]. Subsequently, this Court entered a Scheduling Order setting January 31, 2006, as the deadline for filing amended pleadings. [Docket No. 10]. That deadline has never been extended.

On September 19, 2006, the Court adopted the parties' jointly proposed amended Scheduling Order that extended the fact discovery deadline to September 29, 2006, and extended the deadlines for filing expert reports, completing expert depositions, filing dispositive motions, and for the final pre-trial conference. [Docket No. 16]. At that time, the plaintiff made no request to extend the already expired deadline for amendments to the pleadings.

In disregard of the Court's deadlines and the Local Rules, the plaintiff improperly moved for leave to file a Second Amended Complaint on October 26, 2006. [Docket No. 22]. Contrary to the requirement of Local Rule 7.1(B)(1), that motion was unsupported by a memorandum of reasons and failed to provide good cause for the belated request, as the Scheduling Order required. In an attempt to cure the failure to comply with the Local Rules, the plaintiff then belatedly filed an affidavit of counsel Alan Fryer (the "Fryer Affidavit"), which asserted that the plaintiff learned only recently of the facts underlying the proposed claims. The plaintiff has now filed the present Motion, asking the Court to extend the expired amendments deadline.

## Argument

I. **NO GOOD CAUSE EXISTS TO AMEND THE SCHEDULING ORDER BECAUSE NO NEW EVIDENCE SUPPORTING THE PROPOSED CLAIMS WAS DISCOVERED DURING DISCOVERY**

Despite burdening this Court with a second attempt at showing good cause, the plaintiff still has not provided any valid reason for the neglect to comply with the Court's deadlines. The good cause test requires the plaintiff to explain her lack of diligence for the belated request to extend the deadlines in the Scheduling Order. O'Connell v. Hyatt Hotels of Puerto Rico, 357

F.3d 152, 154-155 (1st Cir. 2004); Berwind Prop. Group Inc. v. Envtl. Mgmt. Group, Inc., 233 F.R.D. 62, 66 (D. Mass. 2005) (the "good cause" standard under Fed. R. Civ. P. 16(b) "emphasizes the diligence of the party seeking amendment").[1] Such motions should not be granted simply upon demand. Rather, the plaintiff has the burden to provide a plausible and valid reason for the inaction.

Where motions to amend the complaint are filed after the scheduling order deadline, the plaintiff's proposed additions cannot be repetitive, see Cabana v. Forcier, 200 F.R.D. 9, 15 (D. Mass. 2001) (denying request to extend a scheduling order deadline where the addition would have been duplicative),[2] or based on facts already known, Berwind, 233 F.R.D. at 67 (the propriety of the proposed additions "did not just become obvious"), or based on facts, the relevance of which, the plaintiff should have known since initiating the litigation. See Cabana, 200 F.R.D. at 15. Moreover, prejudice to the defendant is irrelevant in determining whether the plaintiff has been diligent in seeking amendment.[3] If the plaintiff was not diligent, there is no good cause and the inquiry should end.

### A. Plaintiff Has Long Known of the Factual Predicate for the Proposed Claims

The plaintiff argues that good cause exists because, during the August 1, 2006 deposition of John Fabiano, the plaintiff uncovered "new evidence" that the proceeds from the medical malpractice judgment were delivered to the defendants by Mr. Meyer's messenger, rather than

---

[1] In an effort to meet the burden of showing good cause, the plaintiff's Motion inappropriately confuses the Fed. R. Civ. P. 16(b) cases with the Fed. R. Civ. P. 15(a) cases discussed below.

[2] The plaintiff misapplies Cabana in her Motion. First, unlike here, the Cabana motion to amend the pleadings was filed in accordance with the scheduling order's amendment deadline. Further, the proposed amendment in Cabana was actually a compulsory counterclaim by the defendant. Thus, the portions of the Cabana opinion relied upon by the plaintiff have nothing to do with good cause or even Fed. R. Civ. P. 15(a). In fact, in Cabana, this Court denied a motion to modify the scheduling order deadlines. In denying the request, the Court concluded that (1) the proposed addition would have been duplicative and (2) the relevance of the proposed addition should have been clear to the plaintiff from the beginning of the action.

[3] Although Berwind and O'Connell involved the addition of new defendants, as opposed to new claims, that fact made no difference to the analysis. The courts focused on whether the plaintiffs had met their burden to show good cause, and not on whether the proposed amendment would cause prejudice.

by plaintiff's father, David Burns.[4]  Plaintiff's Memorandum, at 5-6; Fryer Affidavit at ¶ 16. This discovery supposedly alerted the plaintiff to a potential conversion claim. But the plaintiff has already pleaded the very same "fact" in the original Complaint, Docket No. 1, at ¶ 13 ("[u]nder a cover letter dated May 27, 1999, Meyer delivered to John Fabiano, Esquire of Hale and Dorr a check in the amount of $2,425,949.96"), and her Amended Complaint, Docket No. 8, at ¶ 13 (same).[5]

Similarly, the plaintiff claims that it was not until the deposition of Andrew Meyer that the plaintiff knew there was "an understanding that a trust would be created," Fryer Affidavit at ¶ 13, or of the terms of the "contractual agreement" with the defendants. Plaintiff's Memorandum, at 5-6; Fryer Affidavit at ¶¶ 10-14. But the plaintiff made the same allegations in her original Complaint, Docket No. 1, at ¶ 11, the Amended Complaint, Docket No. 8, at ¶ 11, and Plaintiff's Opposition to Defendants' Motion for Partial Judgment on the Pleadings, Docket No. 13, at 3. Further, since the inception of this suit, the plaintiff has asserted that there was an "agreement" between Mr. Meyer and Hale and Dorr. See Docket No. 1, at ¶ 11 ("Meyer, on behalf of the plaintiff, entered into an agreement with Hale and Dorr to have Hale and Dorr create a so-called Special Needs Trust"); Docket No. 8, at ¶ 11 (same); Docket No. 13, at 3 ("Meyer ... asked H&D to create a special needs trust ... H&D agreed").

---

[4]   On December 6, 2006, the Plaintiff filed a motion to correct paragraph 16 of the Fryer Affidavit. In that paragraph, the plaintiff's counsel asserted that it was during Mr. Fabiano's, and not Mr. Meyer's deposition, that the plaintiff first learned that the check was delivered by messenger. In support, the plaintiff cites Mr. Fabiano's deposition transcript at page 10, lines 1-4. But in that portion of Mr. Fabiano's testimony, which is not attached to the Fryer Affidavit, Mr. Fabiano makes no statement concerning the check delivery. In fact, Mr. Fabiano testified that in a meeting with David Burns, Michael Fay of Hale and Dorr, and Jeffrey Anthony of HDCM, "they handed the check over." Fabiano Dep. 18:1-11, Exhibit A. Mr. Fabiano testified that the May 27, 1999 enclosure letter was delivered by messenger. In any event, plaintiff fails to explain how the method of delivery of a check gives rise to a claim for conversion or breach of contract.

[5]   The plaintiff's Motion concedes as much, but later contradicts itself by stating that plaintiff has only recently learned this fact. Plaintiff's Memorandum, at 5. Plaintiff cannot have it both ways.

US1DOCS 5968964v1

Thus, far from being "new," the plaintiff's purported evidence is stale and duplicative of what has already been alleged since this litigation was initiated over eighteen months ago. As such, the plaintiff has known or, at least should have known, of the necessity of timely adding claims for conversion and breach of contract. Therefore, only the plaintiff's lack of diligence can explain the failure to assert the proposed claims until now.

### B.  Plaintiff's Purported Supporting Evidence is Contradicted By the Record

None of the deposition excerpts cited by the plaintiff and attached to the Fryer Affidavit contain support for either a claim of conversion or breach of contract. Rather, the record cited actually contradicts the plaintiff's alleged supporting evidence.

First, although the plaintiff rests the conversion claim on the "fact" that Andrew Meyer directly delivered the check to the plaintiff, Mr. Meyer actually testified that he had no memory of how the check was delivered, but that he guessed that he gave the check to David Burns, who "took it over to Hale and Dorr." See Exhibit A to Defendant's Opposition, Docket No. 30. Similarly, although the plaintiff claims that Mr. Meyer's deposition revealed the substance of his "contractual agreement" with the defendants, Mr. Meyer's cited testimony makes no reference to any offer, any acceptance, any signed writing evidencing an agreement, anything given in exchange by Mr. Meyer, or any other tell-tale sign of a contractual agreement. Thus, the plaintiff's cited testimony actually undercuts the support for the proposed new theories of conversion and contract. Therefore, no good cause exists to modify the scheduling order and the plaintiff's Motion should be denied.

## II. THE PLAINTIFF HAS UNDULY DELAYED SEEKING TO AMEND THE COMPLAINT

Even were the Court to find good cause to amend the Scheduling Order, the motion to file a Second Amended Complaint should nonetheless be denied because the plaintiff has caused undue delay. After the period during which the plaintiff may amend the complaint as of right has expired, the plaintiff must either secure the defendant's consent for amendment or persuade the Court that a valid reason exists for the amendment. See Forman v. Davis, 371 U.S. 178, 182 (1962).

Where a plaintiff possessed the knowledge necessary to amend the complaint for some time, yet did not move to amend, the plaintiff has the burden of showing some valid reason for the neglect and delay. Acosta-Mestre v. Hilton Int'l of P.R., 156 F.3d 49, 52 (1st Cir. 1998); Rivera Velez v. Puerto Rico Elec. Power Auth., 201 F.R.D. 289, 291 (D. Puerto Rico 2001) (especially where as here, "considerable time has elapsed between the filing of the complaint and the motion to amend").[6] Such is the case even where the plaintiff does not act in bad faith, regardless of the extent of prejudice to the defendants.[7] Acosta-Mestre, 156 F.3d at 52 (finding that undue delay, by itself, can be a sufficient basis for denying leave to amend). Further, leave to amend has been denied even where fact discovery was not completed. Id. (close of discovery

---

[6] Courts regularly deny leave to amend in cases where there have been much shorter delays than the plaintiff's here. See, e.g., Sandcrest Outpatient Serv., P.A. v. Cumberland County Hosp. System. Inc., 853 F.2d 1139, 1148 (4th Cir. 1988) (eight month delay between filing the original complaint and the motion to amend); Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995) (fourteen month delay); Acosta-Mestre, 156 F.3d 49 (fifteen month delay).

[7] Adding the plaintiff's proposed claims at this late stage would involve prejudice to the defendants. Issues of contract and ownership of the check containing proceeds from the medical malpractice award were not substantially addressed by the parties during the course of discovery. The plaintiff's breach of contract claim would likely require the defendants to reopen fact depositions to ascertain the extent to which there was a meeting of the minds between Andrew Meyer and certain attorneys at Hale and Dorr. The plaintiff's conversion claim may require the defendants to incur the additional cost of retaining an expert on negotiable instruments and assert additional defenses. New discovery on the conversion defenses could prove difficult since the banks reportedly have destroyed the check. Moreover, the plaintiff has long known of the factual predicate of her proposed claims and therefore has had a substantial headstart in preparing to litigate them. In addition, the Scheduling Order would need to be amended to further postpone the close of fact discovery, filing of expert reports, completing expert depositions, filing of dispositive motions, and perhaps the trial date.

was one month away); <u>Rivera Velez</u>, 201 F.R.D at 290 (discovery deadline was two months away). That the plaintiff seeks to add new claims, and not new defendants, does not alter the plaintiff's burden to explain the delay. See <u>Rivera Velez</u>, 201 F.R.D. at 291 (denying leave to amend the complaint to add new causes of action).

The plaintiff's proposed claims are not based on any new discovery or any factual matter that the plaintiff was not aware of when the original Complaint, and later the first Amended Complaint, were filed. Alleged claims of conversion and breach of contract could have been pleaded when the plaintiff first initiated this action in May of 2005. Likewise, those claims could have been pleaded when the plaintiff amended the Complaint in October of 2005. The plaintiff could even have asked to extend the pleading amendment deadline when the Court modified the Scheduling Order on September 19, 2006. Instead, the plaintiff has sat silent for eighteen months, as this litigation proceeded through seventeen depositions and now nears completion of extensive fact discovery. Such is not the conduct of a diligent party and this Court should not permit this untimely eleventh hour motion.

## CONCLUSION

For all the foregoing reasons, the defendants respectfully request that the plaintiff's Motion for Further Amend Scheduling Order be denied.

                    Respectfully submitted,

                    HALE AND DORR LLP, WILMER CUTLER
                    PICKERING HALE AND DORR LLP, HALDOR
                    INVESTMENT ADVISORS LIMITED
                    PARTNERSHIP, and HALE AND DORR
                    CAPITAL MANAGEMENT LLC

                    By their attorneys,

                    /s/ Mary B. Strother
                    Jerome P. Facher (BBO #157240)
                    Mary B. Strother (BBO #631682)
                    WILMER CUTLER PICKERING
                    HALE AND DORR LLP
                    60 State Street
                    Boston, MA 02109
                    Phone: (617) 526-6000
                    Fax: (617) 526-5000

Dated: December 15, 2006

## CERTIFICATE OF SERVICE

I, Mary B. Strother, hereby certify that I served a true and correct copy of the foregoing Opposition to Plaintiff's Motion for Leave to File a Second Amended Complaint upon R. Alan Fryer, Badger, Dolan, Parker & Cohen, One State Street, Suite 600, Boston, Massachusetts on this 15th day of December, 2006 by electronic service through ECF, and by first class mail.

                    /s/ Mary B. Strother
                    Mary B. Strother

# EXHIBIT A

John Fabiano
Volume 1 - August 1, 2006

---

Page 18

1   Q. Do you recall who delivered the letter to
2   you?
3   A. No. I'm sure it was a messenger. It
4   wasn't Drew or Kelly.
5   Q. Do you remember meeting with Mr. Burns
6   about the time that the check arrived?
7   A. I have a memory that I went down to a
8   conference room and there were people in the
9   conference room. Michael Fay. I don't remember
10  whether Jeff Anthony was there, and Mr. Burns, and
11  they handed the check over.
12  Q. But you remember the check actually being
13  delivered to you?
14  A. Yes.
15      (Dorothy Bickford has entered the room.)
16      MR. FRYER: This is Dorothy Bickford.
17  Q. In the letter marked Exhibit 4 it refers to
18  the check being enclosed, correct?
19  A. Yes.
20  Q. And it goes on to say that it represents
21  the proceeds due to the Alexis Burns Trust. Do you
22  see that?
23  A. I see those words.
24  Q. Do you have an understanding of what was

Page 19

1   being referred to by the words Alexis Burns Trust?
2   A. No. I don't have any memory of discussing
3   the payee. I remember calling and saying I need the
4   check, where is the check, and it was delivered to
5   me.
6   Q. Do you have a memory of ever having any
7   discussion with Mr. Meyer about the funds that he
8   recovered for Alexis Burns being placed into a
9   trust?
10  A. I do not.
11  Q. Did you look at the check when the letter
12  arrived?
13  A. I'm certain I did, if for nothing else to
14  make sure the amount was right.
15  Q. If you look at Exhibit 5, do you see that
16  the payee on the check is David Burns, trustee?
17  A. I see that's what it says.
18  Q. And it says in the reference in the lower
19  left that it is for Burns, A?
20  A. Yes.
21  Q. Did you understand the Burns, A to be a
22  reference to Alexis Burns?
23  A. I don't remember thinking about it then. I
24  would interpret that now as being for Alexis Burns.

Page 20

1   Q. Do you remember having any thoughts about
2   the payee indicating that it was payable to David
3   Burns as trustee?
4   A. No, I do not. As far as I was concerned,
5   this was money that was going to be invested by
6   David Burns with Haldor. I didn't think any further
7   about it than that.
8   Q. Now, you indicated a moment ago that you
9   had reviewed some of your firm's invoices in
10  connection with this matter; is that correct?
11  A. I simply looked at my own time entries on
12  the bill.
13  Q. Let me show you a letter dated December 29,
14  1999 with Bates number HD 0852 with an invoice
15  attached. Is that the invoice that you were
16  referring to?
17  A. Yes. The invoice is what I looked at. I
18  don't remember if it was attached to the letter. I
19  didn't look at the letter. I just looked at the
20  entries on the detail sheet of the bill.
21  Q. Now, the invoice consists of a summary page
22  at the beginning; is that right?
23  A. Yes.
24  Q. That's the first page after the letter?

Page 21

1   A. Mm-hmm.
2   Q. And following that are the detail entries?
3   A. Yes.
4   Q. Now, if you look at the first page of
5   detail entries which has Bates number HD 0854, the
6   first entry reflecting time billed by you is May
7   24th?
8   A. That's correct.
9   Q. And there's another entry on May 27?
10  A. Yes.
11  Q. And the May 24th entry corresponds to that
12  meeting that you referred to earlier?
13  A. Yes. I think that's the sales pitch
14  meeting, bring the money to Haldor.
15  Q. And that meeting is described in the
16  invoice as conference with Mr. Burns, Mr. Fay and
17  Mr. Anthony?
18  A. Yes. And the telephone from Mr. Burns, I
19  have some vague memory that he got lost on the way
20  down from New Hampshire and called me for
21  directions. I don't think it is anything beyond
22  that.
23  Q. So your time entry for that day totals an
24  hour and a half, correct?